## GAINES *v*. NEW ORLEANS.

1. By the law of Louisiana, if a man *bonâ fide* believe a woman free to marry him on account of the invalidity of a former marriage; and with such a belief of this, does marry her, such marriage has its civil effects; and the child born of it is legitimate, and can inherit its father's estate.

2. The fact of marriage being proved, the presumptions of law are all in favor of good faith.

    The court finds as a fact that there was a marriage in good faith between the late Daniel Clark, of New Orleans, and Marie Julie (Zulime) Carriere, of the same place, some time before the birth of the present Myra Clark Gaines.

    The said Myra can, therefore, take the estate of Clark left to his said daughter by an olographic will made in 1813; the same having been the last will made by him; and having been duly admitted as such to probate by the courts of Louisiana having competent jurisdiction.

3. The probate of a will duly received to probate by a State court of competent jurisdiction, is conclusive of the validity and contents of the will in this court.

4. A will made a short time before a testator's death acknowledging a child as his legitimate and only daughter, is to be regarded, on a question of legitimacy, as an affirmative evidence of great weight; and in the nature of a dying testimony of the testator to the fact.

5. The probate of a will of later date necessarily and by the mere fact of its probate annuls a prior will, so far as the provisions of the two are inconsistent, and so far as the estate was not legally administered under the earlier will.

    Accordingly, Clark's will of 1811 was annulled by his will of 1813.

6. The power of executors in Louisiana to make sale of real estate there, terminated by the code in force in 1813, in that State, at the end of a year from their appointment, unless there was an order of court to sell. A sale made after the expiration of the year, in a case where no order of court was shown, and where the will itself gave no power of sale, was a nullity.

    Accordingly, sales made in 1819–20–21, &c., by Relf & Chew, as executors of Clark's will of 1811, proved in that year, passed no title.

7. The deed of a sole instituted heir gives no title by the law of Louisiana as against the real and paramount heir.

    Accordingly, deeds of Mrs. Mary Clark, mother of Daniel Clark, did not pass his property as against Mrs. Gaines, his only legitimate daughter.

8. On suit brought by such real and paramount heir claiming under a will of one date to recover possession, it is no defence by a party in possession under sales made by the executors or alleged instituted heir under an earlier and now annulled will, that the estate of the testator

was insolvent; a fact, however, which the court considers not to be predicable of Clark's at his death.

9. Testamentary accounts confirmed by a probate court "in all respects in which they are not opposed," cannot be regarded as "duly homologated," so as to conclude persons whose opposition has never been withdrawn, but is still active.

Of this character has been the opposition of Mrs. Gaines to the accounts filed by Relf & Chew, executors of the will of Clark made in 1811.

10. A probate court cannot by subsequent order give validity to sales of real estate made by executors, which were void by the laws of the State where made.

11 Where each of two parties claim title from one person as a common source, neither, by the law of Louisiana, is at liberty to deny that such person had title.

Accordingly, where Mrs. Gaines, out of possession, claimed under a will of Clark made in 1813, and adverse parties claimed under an earlier will of the same person, it was not competent for these last to show that as to two-thirds of the property in contest, the equitable title was not in Clark at all, at his death, but in his partners in trade, Chew & Relf.

Independently of this, the court expresses itself as not at all disposed to regard as a " valid and executed contract " a partnership agreement by which it was sought to prove such ownership out of a testator at his death, and in his partners (who were the executors also of one will of his), the agreement itself having for twenty-five years not been made known either to creditors, purchasers, or the Court of Probate, and only now produced to be used in a collateral way, and one which, in effect, would show that neither party to a suit wherein each claimed title, had it.

12. Although, when a claimant is endeavoring to establish an *equitable* title, a court of equity may refuse the use of its peculiar powers in aiding to establish it against the purchaser of the legal estate, who has acquired it fairly and honestly, yet where the complainant is not doing this, but is asserting a right to the *legal* estate, it does not follow that he loses that right, because the defendant may have purchased in good faith what he *supposed* was the legal title.

13. The case of *Gaines* v. *Hennen* (24 Howard, 615) concludes question upon the sufficiency of any plea of prescription, similar to the one set up in that case. The one in the present case being similar, the court treat its sufficiency as a question not open for argument.

14. The questions of law and fact applicable to the rights of Mrs. Gaines in the estate of her father, Daniel Clark, were determined in the case of *Gaines* v. *Hennen*, a case here solemnly affirmed.

THIS case came here upon appeal from the Circuit Court of the District of Louisiana.

It was a bill in equity, filed by Mrs. Myra Clark Gaines,

December 22d, 1856, against certain defendants, in which she sought to recover very valuable real estate, situated in New Orleans, which belonged, as she alleged, to Daniel Clark, her father, who died in New Orleans, in August, 1813, Mrs. Gaines claiming title as universal legatee under a last will of his made in 1813.

The bill alleged,—

1st. That the complainant was the only legitimate child of Clark.

2d. That all the property sought to be recovered belonged to Clark at his decease.

3d. That at his death he left a valid last will and testament in which the complainant was declared his only legitimate child, and made his universal legatee, subject to certain payments.

4th. That this will of 1813, having been lost or destroyed, it was duly recognized and admitted to probate by the Supreme Court of Louisiana in 1856, and ordered to be executed.

5th. That Clark had made a provisional will in 1811, in which he made his mother, Mary Clark, his universal legatee and sole heir, and appointed Richard Relf and Beverly Chew the testamentary executors thereof; which will of 1811 was revoked by the will of 1813, but that Relf & Chew wrongfully obtained the probate of the will of 1811, and illegally administered the estate under it; making sales fraudulently and with notice of the complainant's equities, &c.

6th. That the complainant was a minor until 1827, and ignorant of her parentage and rights in her father's estate until 1834, and that from that time to the present she had persistently claimed this estate, and diligently sought its recovery by all the legal means in her power.

The bill sought a discovery from the defendants, and prayed a delivery of the property, and an account of the rents and profits, and for general relief.

THE ANSWER of the defendants admitted the possession in them of the property claimed in the bill, and that the *legal*

title thereof was in Clark, at the time of his death in 1813; but they set up—

That Clark's title passed to them or their grantors by virtue of sales made by Relf & Chew, as testamentary executors of the will of 1811.

That this title passed also under sales made by Relf & Chew, as attorneys of Mary Clark, "sole heir and legatee" of the will of 1811.

That the estate of Clark was insolvent.

That the accounts of Chew & Relf reporting the sales had been duly approved by the Probate Court of New Orleans; and that this was binding on the complainant.

That an equitable title to two-thirds of the property was in Relf & Chew, and creditors of Clark, by virtue of certain partnership articles, of June 19th, 1813.

They also pleaded the prescription of five, ten, twenty, and thirty years; and that they are "purchasers in good faith, without notice, for a valuable consideration;" and that they are purchasers from "purchasers in good faith, without notice, for a valuable consideration."

They also relied upon the nullity of the probate of the will of 1813, by the Supreme Court of Louisiana, in 1856, there having been no decree of nullity of the prior will of 1811.

Upon these issues judgment was rendered against the complainant, and from such judgment it was that the present appeal was taken.

The case with two accompanying it constituted the seventh, eighth and ninth appeals to this court of a controversy known as the "Gaines case." For more than one-third of a century, in one form and another, it had been the subject of judicial decision in this court, and the records now—complicated in the extreme—reached nearly eight thousand closely printed pages. If this court, when the case was last heard before it,* spoke of it as "one which, when hereafter some distinguished American lawyer shall retire from his

---

* A.D. 1860, 24 Howard, 615.

practice to write the history of his country's jurisprudence, will be registered by him as the most remarkable in the records of its courts," the present reporter will surely be excused, if, in that haste which a speedy publication of current decisions requires, *he* shall, from such records as he has described,—and in a matter where as to facts, simply, this high tribunal has been always largely divided on the evidence,—have attained much less than perfect accuracy of detail or even than the truest form of presentation generally. As far as he has himself conceived the case from the huge volumes in which it was imbedded—but deprecating reliance upon his statement in any matter affecting property involved in these issues if, contrary to the hope expressed by this court, further question about property is anywhere to be made—the subject, in its outlines and general effect, seemed thus to present itself:

The close of the last century found residing at New Orleans, then but a small town, a person named Daniel Clark. He was a native of Ireland, born at Sligo about the year 1766, but had received an education in England, at Eton and other places there. Before reaching the age of 21 he had come to New Orleans by invitation of an uncle already resident there; a person of some consideration, and to whose property he succeeded in 1799. He is described as having been a man of much personal pride and social ambition, of high intelligence, full of enterprise, and though "very peculiar in some respects" (and, in at least one, censurable), to have been characterized by numerous chivalric and honorable dispositions. His pecuniary integrity was unquestioned. He became early an actor in the events of his day and region, a leader of party there, and connected either by concert or by opposition with many public men of the time. To him more than to almost any one, as it seemed, was to be attributed the acquisition by our country of the State of Louisiana. He had been consul of the United States there before the acquisition, and in 1806-8, represented the Territory in Congress; its first representative in

that body. Everywhere his associations were of a marked kind, and with people of social importance. Up to 1808 or 1810 he was engaged in commercial affairs on a considerable scale, and extending from New Orleans to Montreal; being associated at New Orleans with two gentlemen, both long known there as occupying positions of public trust, Messrs. Richard Relf and Beverly Chew, as partners, and in Philadelphia with the late Daniel W. Coxe, a person of distinguished standing in that city. With Mr. Coxe his relations began so far back as 1791. Mr. Clark died in New Orleans August 16th, 1813, at the age of 48, and, as was commonly reputed, a bachelor; but as was testified, engaged to be married to a lady of that place, Madame ——, previously married and now divorced. No will but one, dated in 1811, was found after his death. It left his property to his mother, who with her husband had followed Daniel Clark to this country, and was now resident at Germantown, near Philadelphia; but of any wife or child, or children, lawful or illegitimate, it said nothing. That document had been made on the eve of a voyage from New Orleans to Philadelphia, and was in these words:

"IN THE NAME OF GOD, AMEN! I, Daniel Clark, of New Orleans, do make this my last will and testament: Imprimis, I order all my just debts to be paid; second, I leave and bequeath unto my mother, Mary Clark, now of Germantown, in the State of Pennsylvania, all estate, whether real or personal, which I may die possessed of; thirdly, I hereby nominate and appoint my friends, Richard Relf and Beverly Chew, my executors, with power to settle everything relating to my estate.

"DANIEL CLARK.

"NEW ORLEANS, 20th May, 1811."

A few hours after Clark's death allegations were made by one Chevalier Dusuau De la Croix,—who represented that he had "strong reasons to believe, and did verily believe, that such a will was executed," and that he was interested in it,—of a later will, and a petition was presented to the Court of Probate, in New Orleans, setting forth the probable

existence of such a will, and praying that each one of the different notaries of the city might appear before the court immediately, " in order to certify if there does or does not exist in his office any testament or codicil or sealed packet deposited by the said late Daniel Clark." None such was produced. The will above quoted was therefore proved before Judge Pitou, Judge of Probate, hereafter mentioned, and under it Relf and Chew, the persons named in it as executors—his already mentioned partners in trade—disposed of Clark's estates.

Soon after the time that Clark first found himself at New Orleans, was living there also a native of Clermont, France, named Jerome Des Granges. Des Granges made some pretensions to family importance at home, but in New Orleans was a confectioner; making and vending syrups and liquors also, and having a distillery. He had married in 1794, with the ceremonies of the Roman church, a young person of New Orleans, Zulime de Carriere, not then, as it seemed, above fourteen or fifteen years old, a native of New Orleans, from French parents in Gascony and Bordeaux, and was living with her as, his wife: a person whom various testimony proved to have been remarkable for beauty.

With Zulime, Clark became acquainted, and formed an illicit connection in or prior to 1801.

In the spring of the year just named Des Granges sailed for France, his apparent purpose there being the recovery of some property, to which his wife and her sisters, two of whom were Madame Despau and Madame Caillavet, were entitled. On the 26th of March, in the same year, these all gave to him—describing him as " our brother-in-law"— a power of attorney of the fullest kind to act for them. Des Granges in turn on that same day gives to Marie Zulime Carriere, describing her as "my legitimate wife," a like power to act for him. Under this last, Zulime did act for him frequently; and on *the 9th of November*, 1801, *being then in New Orleans, substituted her brother-in-law Caillavet* to receive for her certain moneys, &c. In this she describes herself, as in previous papers, as " the legitimate wife" of Des Granges.

When exactly Des Granges sailed did not appear; but he was in Bordeaux in July, 1801, and in that month writes to Clark, thanking him for letters of introduction, &c. He adds:

"When one has a friend such as you, he cannot feel too deep an interest in him. . . . I have taken the liberty to inclose a package for my wife, which I beg you to remit to her. Permit me, my dear friend, to reiterate my acceptance of the kind offer you made me before I came away, and should my wife find herself embarrassed in any respect, you will truly oblige me by aiding her with your kind advice."

Des Granges returned to New Orleans "a few months" prior to the 4th of September, 1802. He was there on that day.

While Des Granges was absent in France, Zulime was found pregnant, and was sent by Clark from New Orleans to Philadelphia, with letters introducing her to his friend and partner, Mr. Coxe. These letters informed Coxe that the pregnancy was by him, Clark, and asked that Madame Des Granges might be provided with suitable lodgings, medical attendance, and other matters necessary in such a case. The matter was all attended to by Mr. Coxe, "as the friend of Clark," and arriving at term the child was born; a girl, who received the name of Caroline. She lived in Philadelphia during childhood with her nurse, and more or less under Mr. Coxe's eye, until, becoming older, she was placed in another family in the country, in accordance with Clark's desire to have her put where her "health, morals, and education would be attended to." She remained in or near Philadelphia till she grew up, Clark, while he lived, paying her expenses. Arriving at womanhood, she was respectably married to a person named Barnes.

Madame Despau, a sister of Madame Des Granges, was with this last on the occasion of the birth of this child. As to Clark's presence in Philadelphia at the same time with these two sisters, and as to the date of this common presence there,—a matter of some importance, it may perhaps be thought, in a subsequent part of the narrative,—we speak

further on. There was no doubt that the two sisters were in Philadelphia while Clark was there, not long before a certain voyage which he made from Philadelphia and New York for Europe, and of whose date we speak hereafter.\*

The birth of the child was stated by Madame Despau to have been in 1801, though she said nothing about the place or circumstances of its birth. Mr. Coxe fixed it, according to his belief, in April, 1802.†

As soon after the birth of the child thus just mentioned as was prudent, Zulime returned to New Orleans, Des Granges apparently knowing nothing of what had occurred.

An incident of some importance now took place; deserving mention here chiefly as being much referred to in testimony given further on by the sisters of Zulime. It was an arrest by the church authorities of Des Granges, for bigamy.

An ecclesiastical record, dated 4th September, 1802 (Louisiana being still under Spanish and Catholic regulations) recited that it had been reported in all the city, publicly and notoriously, that Des Granges, at the time of his marriage with Zulime in 1794, and now, was married "to Barbara Jeanbelle, *who has just arrived;*" that the said Des Granges, having arrived from France "a few months since," had caused another woman to come here. The record continued: "And as it has been ascertained that the said Des Granges is about to depart with the last of his three wives, let him be placed in the public prison during these proceedings." Des Granges, Barbara Jeanbelle (signing herself,

---

\* See *infra*, p. 678.

† The exact date of Zulime's arrival in Philadelphia was not fixed. Mr. Coxe, who was examined in different branches of the Gaines controversy, once in 1841 and once in 1849, said, on the first occasion: "*In or about* the year 1802, Madame Des Granges brought me a letter from Daniel Clark, introducing her, and informing me in confidence." In the second he said: "In the *early part of the year* 1802." . . . With regard to the letter itself introducing Zulime, he stated his impression to be, that owing to its nature he had destroyed it at the time, or soon after reading it; if not, that it had been burnt in 1806, in which year his counting-house was consumed by fire. The records in New Orleans showed that *Zulime was in that city, November 9th,* 1801; as also on the 6th September, 1802.

"B. M. Zambell *de Orsi*," and sometimes so styled in the proceedings), Zulime, and the "other woman," whose name, it seemed, was Yllar, were all examined by these ecclesiastical authorities. Des Granges and Barbara both stated that, about eleven years previously, he, Des Granges, had courted her in New York. She said that it had been her intention to marry Des Granges; that she obtained her father's permission to go to Philadelphia in order to be married; that while there, Des Granges begged her to come to New Orleans to consummate the marriage, which she refused to do, and as he was coming away that she changed her mind; that she then afterwards, at Philadelphia, married one Soumeyliat, with whom she went to Bordeaux; and was living there at the time when Des Granges lately arrived there; that he there found her—Des Granges himself stated, "by mere accident." According to Des Granges' account, the father of Barbara had refused his consent to the marriage because he was poor. What brought Madame Soumeyliat just now to New Orleans did not at all appear.

The other woman testified that she had come to this country only because, having asked Des Granges at Bordeaux, to tell her if it held out better inducements in order to gain a livelihood by sewing, he had advised her to come.

Zulime, being asked if she had heard that her husband was married to another woman, answered that, "about *a year since*, she heard it stated in New Orleans that her husband was married in the North, and that in consequence she wished to ascertain whether it was true or not, and she left this city for Philadelphia and New York to ascertain the truth of the report. She had learned only that he had courted a woman, whose father, not consenting to the match, it did not take place, and she married another man shortly afterwards.". She added, that the report of her husband marrying three women had caused her no uneasiness, as she was satisfied it was not true.

Des Granges being asked, " why his wife went to the North last year?" answered, "that the principal reason was that a report had circulated in this city that he was married to

another woman; and that she went because she wished to ascertain whether it was true; that he had brought no documents to prove his innocence," taking it for granted that it would naturally fall, his wife being satisfied of it.

The record concluded with this

### DECREE.

"Not being able to prove the public report which is contained in the original decree of these proceedings, and having no more proofs for the present, let all proceedings be suspended, with power to prosecute them hereafter, if necessary, and let the person of Geronimo des Granges be set at liberty, he paying the costs."*

It is, however, a noteworthy circumstance, perhaps, that though no evidence of the marriage of Des Granges and Barbara was produced in the ecclesiastical proceeding, there was produced in the present case a certificate in Latin, dated New York, 11th September, A.D. 1806, apparently from the Rev. W. V. O'Brian, pastor of St. Peter's Roman Catholic Church in that city, certifying that he had married, on the 6th July, 1790, "Jacobum Degrange and Barbara M. Orci." The original records of the church were now burnt.

However, Des Granges left the place, and did not return to New Orleans prior to 1805.

As respected the fact of bigamy, Madame Benguerel, a witness in this case, testified that she and her husband were well acquainted with Des Granges, and with a person whom he married "before he imposed himself on Zulime," and that reproaching him for his baseness in the latter act, "he endeavored to excuse himself by saying, that at the time he married Zulime he had abandoned his lawful wife, and never intended to see her again."

*At this point of the history arose the great question of this case,*

---

* In addition to this ecclesiastical proceeding the complainant alleged that there had been a criminal prosecution. Indices of such proceedings in New Orleans, prior to 1803, existed there, but disclosed none against Des Granges. However, about the time of the cession, the Spanish Government had carried off many records, which were now lost, or difficult of access.

*a question namely, whether anywhere about this time, that is to say, in or anywhere between the early part of* 1802 *and the end of* 1803,—*after the birth of the child just mentioned,—any marriage ceremony had been performed between Clark and Zulime.* It was alleged on the one side that one had been performed in Philadelphia in 1803, or, possibly, in 1802. The other side denied that one had been performed anywhere. The matter will be entered upon hereafter.

Whether really married or not, Zulime became pregnant again, and of this pregnancy, Myra, the present complainant (wife in first marriage of W. W. Whitney, Esq., and in second of General E. P. Gaines, and now widow of this last), was born in New Orleans some time in 1804 or 1805 or 1806. The immediate place of the birth was the house of a friend of Clark named Boisfontaine, then casually unoccupied; another friend, a protégé of Clark's, who had been a sea-captain and afterwards in the army, Colonel Davis, a brother-in-law of Boisfontaine, making the specific arrangements.

" The child," said Davis, in an account found in the record, " was placed where it was supposed she would be properly attended to, and Mr. Clark having left New Orleans for a short time soon after, I consented to see that this was done. It was soon apparent that the infant was neglected, and after some hesitation I communicated the facts to my wife. She went at once to see the child, was touched with compassion at her forlorn and desolate condition, and consented to take her at once to her own house. There Mr. Clark found her on his return. He did not wish to acknowledge her publicly as his own, and Mrs. Davis having no daughter and becoming attached to the infant, of which she thus accidentally became, as it were, the mother, determined to keep her until she should be claimed by her parents."

When about two weeks old the child was brought to Mrs. Davis's house and there given to a niece of Colonel Davis, Mrs. Harriet Harper, resident in his family. Mrs. Harper had recently had an infant of her own, and this new one was nursed at her own breast instead. The name " Myra"

was given to the child by Colonel Davis, after a niece of his own.

Returning with the narrative to the mother. The exact relations between Clark and Zulime from the birth of the second child up to 1808, did not appear minutely. Clark at all times kept house for himself in New Orleans, and after the birth of the child, Zulime apparently had a house, also supported by Clark. In 1806 he was sent to Congress. A quarrel took place between himself and Zulime while he was away. According to one of her sisters he had "heard things about her," things which, according to the same account, he was satisfied, though at a day too late for any advantage, were "calumnious."* She, according to the same account, was fretted because he would not promulgate what was asserted in the present case to be a marriage. Whatever the cause, the estrangement seemed to have been complete in 1808, or perhaps earlier. Clark, then in Congress, addressed a lady of Baltimore, at this time in Annapolis, of the highest social position. He thus wrote to Coxe in 1808:

WASHINGTON, 12th January, 1808.

MY DEAR SIR:

Your accounts of my visit to Annapolis have been, as usual, much ahead. Whenever I am fortunate enough to induce any one to engage herself to me, I shall let you and Mrs. Coxe both know it; but until I see *jour a mes affaires*, I shall make no engagement.

Remember me respectfully to Mrs. Coxe, and believe me, my dear friend,

Yours sincerely,

DANIEL CLARK.

---

* Mrs. Harriet Harper, another witness, stated that Clark, on going to Washington, left as a servant with Zulime at New Orleans the wife of his own personal servant, a slave whom he much liked, named Lubin; that while he was thus absent, certain individuals who had or supposed they had "a great interest in dissolving his connection with the mother of his child, commenced a plan of breaking it up, by writing to Mr. Clark imputations against her, and by filling her mind with unfavorable impressions against him, till at length his mind was so poisoned, that when he arrived at New Orleans he and she had a severe quarrel and separated; immediately after which she left New Orleans"

WASHINGTON, 9th February, 1808.

MY DEAR FRIEND:

I shall set off this evening for Annapolis, and shall pass two or three days there. If I find Miss —— —— as favorably inclined toward me as you have hinted, I shall endeavor so to secure her affections as to permit me to offer myself to her, at my return to this country in the course of the ensuing winter. I shall first go home to settle my affairs. On this subject I have never yet spoken to her, and I now communicate my intentions to you, that you may inform Mrs. Coxe, who will, I hope, as well as yourself, keep the affair quiet. At my return I shall inform you of the result.

Yours affectionately,<br>
DANIEL CLARK.

WASHINGTON, 14th February, 1808.

MY DEAR FRIEND:

Previous to setting off for Annapolis I informed you of my intention. I am sorry to have now to mention that it not only has not been effected, but that the affair is forever ended. The reasons I will give you when we meet, although they are too trifling in themselves to have caused the effect produced by them. I beg you to state this to Mrs. Coxe, and if you are spoken to on the subject, to state that you have had no knowledge of the affair.

Yours sincerely,<br>
DANIEL CLARK.

This part of the history, Mr. Coxe, in his testimony, narrated thus:

"Clark paid his addresses, with a view to marriage, to Miss —— ——, of Baltimore, granddaughter of the late —— ——, of ——, and was partly engaged to her. He addressed her in the years 1807 and 1808. The engagement was afterwards dissolved in consequence of demands, on the part of the lady's family, of settlements and other stipulations, which convinced him that the match would be ineligible. She afterwards married the Marquis of Carmarthen. now Duke of Leeds. Soon after the rupture of the engagement in the year 1808, he went to New Orleans. The engagement with Miss —— was afterwards, as I understood from Mr. Clark, attempted to be renewed through the intervention of Robert Goodloe Harper, Esq., who had mar

ried into the—— family; but on reflection Mr. Clark thought the connection not desirable, and that the settlements and other stipulations demanded on her part might ruin him; and he relinquished it from these causes, and also in part in consequence of my disapprobation of it, and my belief that it might affect both him and me injuriously."

Some time prior to June 24th, 1806, Zulime filed a petition in the District Court of New Orleans against Des Granges for something. For what exactly, the reporter cannot assert, owing to the fact that the petition itself, having been lost from the court office, made no part of the transcript. The record disclosed only a summons dated June 24th, 1806, to "Mr. Ellerly, curator of Des Granges," "to comply with the prayer of the annexed petition," or to file an answer in eight days. To this petition, Ellerly for the defendant put in for plea—

"That this court ought not to have cognizance of the same, because the laws by which this court was created and the jurisdiction thereof established, do not extend the same to cases of divorce, or give this court any authority to pronounce therein, and because the damages in the said petition prayed for cannot be inquired into or assessed, until after the judgment of this court in touching the validity of the marriage between the petitioner and this defendant shall be first declared."

The defendant subsequently, for answer, said, "that the facts in the said petition are untrue." The certificate of marriage between Des Granges and Zulime made part of this record; and the docket entries completed it, thus:

ZULIME CARRIERE } No. 356.—Brown & Fromentin for plaintiff; Ellerly
       v.                      for defendants.
DES GRANGES. }

Petition filed June 24th, 1806. Debt or damages, $100. Plea filed July 1st, 1806. Set for trial on Thursday, 24th July.

Summons issued for M. Coudrain, Chovot, Mary Marr, Rose Carriere, Christopher Joseph Le Prevost, Trouque, Le Breton d'Orgenoy, and Joseph Villar, Senior.

Attorneys, $10 00   { Mr. Fourke, sworn.
Clerk, . . . 7.87½  { Mr. d'Orgenoy.
                   { Madam Marr.

Judgment for plaintiff. Damages, $100. July 24th, 1806.

In the summer of 1807, Zulime came to Philadelphia with her sister, Madame Despau, again bringing a letter of introduction from Clark to Coxe. Clark was there in April, 1808, and in that month left it for New Orleans. In August, 1808, at Philadelphia, Zulime, in regular form of the church, was married, under the name of Carriere, to a French gentleman of good standing, named Gardette. The marriage register of St. Joseph's Church there thus recorded the fact:

MARRIED. By Right Rev. Michael Egan, James Gardette and Mary Zulema *Carriere*, in the year of. our Lord 1808, August 2.

*Witnesses:* John Morges, John Dubarry, William Martin, John Rowan, and Isabel Rowan.

On this subject, also, Mr. Coxe testified. He said:

"Zulime did know of Mr. Clark's addresses to Miss ——. In an interview between her and me at her request, at her lodgings, she complained to me of Mr. Clark's desertion of her, said she understood he was going to marry Miss ——, and intimated that she considered herself at liberty to marry another. While I was there, Monsieur Gardette came in, and I took my leave. This was the only conversation I ever had with her on the subject. She never informed me, either before or after the death of Daniel Clark, that she had been married to him, nor that Myra Gaines was the legitimate offspring of that marriage."

The parties to the connection above recorded lived for several years after it· in Philadelphia, and resided next in France. They lived reputably together, as it seemed, in both countries, for twenty-three years, acknowledged as man and wife, and on the death of Monsieur Gardette, in 1831, Zulime went into mourning, and, as was said by her sister, received property as his widow. Having had three children, always acknowledged, by this connection, Zulime, after M. Gardette's death, returned with them, or those who survived, to New Orleans; and after living there with them respectably for many years after this controversy began, died in that city in the autumn of 1853. In May, 1836, she transferred to the complainant all rights that she had "in the

estate, property, or succession of the said Daniel Clark."
She was never examined as a witness, so far as her testi-
mony appeared of record, in any part of the controversy;
nor did she ever, through the courts, claim his estate, or so
declare the fact of a marriage with him.

We have mentioned that, in New Orleans, Mr. Clark's
child was taken by Colonel Davis to his own house. In the
spring of 1811, being about to sail from New Orleans to
Philadelphia, Clark made the will, already mentioned, of
1811, and wrote to Davis from shipboard, at the mouth of
the river, mentioning certain evidences of property—then
standing in Colonel Davis's control—which, "in case of
misfortune," he says, "you will dispose of as I have di-
rected." And setting sail from Philadelphia, on his return,
in July following, he incloses to him a communication,
which, "in case of accident or misfortune to me," he directs
Davis to open, and to act in regard to the contents as "I
directed you with respect to the other affairs committed to
your charge before leaving New Orleans." "To account,"
he says, "in a satisfactory manner, to the person committed
to your honor, will, I flatter myself, be done by you when
she is able to manage her own affairs; until when, I commit
her under God to your protection." These deposits of prop-
erty, as Davis stated, related to Myra. Clark had, prior to
all this, placed in Davis's name "as owner" a large amount
of real estate, with instructions to use and place it, for the
best advantage, for his daughter Myra's interest.

In 1812, Davis came with his family to reside in Phila-
delphia, and brought the child with him; Clark now giving
him a sum of twenty-three hundred and sixty dollars.* In
Philadelphia the child was brought up by Colonel and Mrs.
Davis; and commonly known by the name of "Myra Davis,"
though a few particular friends of Davis knew, perhaps, that
she was but an adopted child.

Arriving in Philadelphia, Colonel Davis found the mother

---

* Suit was subsequently brought for this money by the executors of the
will of 1811, and recovered from Davis. He had left his note for it with
Clark

a resident there, not far from his own house. She visited Colonel Davis's but on a single occasion; and had no interviews with the child there or elsewhere, though not in any way formally forbidden to see her. " She once met me," testified Davis, " in the street, with Myra, and stopped to speak to me. She did not speak to Myra, or take any such notice of her that the latter remarked it. But she looked very hard at her."

In 1830, Davis, who had been elected to the legislature of Pennsylvania, being away from home, and having need for certain papers which he had left there, Myra in a search for them came accidentally upon some letters which partially revealed the circumstances of her birth. Exceedingly distressed, it was necessary that Davis, on his return, should disclose to her more fully the history. She was still commonly known as " Myra Davis."

In 1832, she was married to Mr. W. W. Whitney, of New York, whose marriage to her was announced in the newspapers of Philadelphia, as to Miss Myra, " daughter of Col. S. B. Davis." The husband, receiving a number of old letters from Colonel Davis, was struck by an account in one of them, from a person named Bellechasse, and then resident in Matanzas, Cuba, of a will made by Clark just before his death, in 1813, which was said to have been fraudulently suppressed, and by which his now wife, then seven or eight years old, was made sole devisee by Clark of vast property.

Whitney and his wife went to Matanzas, Cuba, saw Bellechasse—an old resident of New Orleans, as it appeared, and an intimate friend of Clark; with him in his last hours, and in his house after his death. From him they got such accounts and such references, that they proceeded to New Orleans to endeavor to establish this will. Whitney began by charging a fraudulent suppression of it on certain persons there, for which he was arrested and put into prison, and compelled to give large bail in order to get out. Getting out, he proceeded to collect his proofs. They consisted chiefly of the testimony of Mrs. Harriet Harper, already named, now sixty years old, by whom the child had been nursed; of Mr.

Statement of the case.

Pierre Baron Boisfontaine, a man of about the same age, who had been for eight years in the British army, and afterwards for several years agent of Clark's plantations; and of Bellechasse himself, an army man like Boisfontaine, till Louisiana had passed to the control of this country. He was now seventy-two years old. The substance of their evidence was this—(one point in controversy, at that time especially, being whether *Myra* was a child of Clark at all;* then whether legitimate; and, finally, whether Clark had left a will in her favor):

Mrs. Harper testified, at different times and in substance, thus:

"Mr. Clark and my late husband were intimate friends. I suckled in her infancy Mr. Clark's daughter Myra. I did it voluntarily, in consequence of her having suffered from the hired nurses. Mr. Clark considered that this constituted a powerful claim on his gratitude, and he afterwards gave me his confidence respecting her. I was residing with my late husband in the family of his uncle, Colonel Davis, when the infant Myra was brought into the family by Colonel and Madame Davis. I had at that time an infant of my own. I was solicited by them to suckle the infant they had brought. Colonel and Madame Davis told me she was the child of Daniel Clark. Mr. Clark afterwards assured me she was his child, and always told me she was his only child; she was always called Myra Clark by the whole family. I never knew her by any other name till after her marriage. Mr. Clark, during his continual attentions to, and while caressing her, ever called her his dear little daughter Myra; his affections and attentions to her seemed to increase with her age; in fact, he showed, and seemed to feel, all the paternal regard for her that the most affectionate father could show to an only child. Her clothing and playthings, which were of the most extravagant and costly description, were provided for her by

---

* One allegation of the defence all through it, and pressed in different stages with more or less confidence, was that the only child of Clark was Caroline, and that, as had been confessed by Zulime, and as others, assuming to know, had verified, "Daniel Clark was imposed upon and deceived into the belief that the said Myra was his child, when in truth she was the child of another man."

Mr. Clark; he also purchased for her a valuable servant. Mr. Clark invariably spoke of her to me as his only child, and as destined to inherit his splendid fortune. I witnessed the continued and increasing parental solicitude of Mr. Clark for his daughter Myra, from her early infancy till 1812, when her departure for Philadelphia with the family of Colonel Davis took place. Mr. Clark continued his frequent visits to my husband and self till his last sickness in 1813. Up to that period he always spoke of his daughter Myra with the most enthusiastic affection.

"On the occasion of the duel which he had with Governor Claiborne, in, I think, 1807, he told me after that affair, that he had previous, by way of precaution, secured to his daughter Myra the amplest provision, in case he should have fallen, and that he had also left documents so arranged as to manifest everything of interest to her. Afterwards, in 1811, when he was about to visit Philadelphia, he told me he had made arrangements, by means of confidential transfers of property, to secure the interests of his said child, and had also left with Chew and Relf a will in favor of his mother; that this will was the result of his situation at the time.

" In 1813, some few months before his death, he told me he felt he ought no longer to defer securing his estate to his daughter Myra by a last will. Near this period he stopped one day at my house, and said to me he was on his way to the plantation of Chevalier de la Croix, for the purpose of requesting him to be named in his will one of his executors, and tutor to his daughter Myra. On his return he told me, with much apparent gratification, that De la Croix had consented to serve, and that Judge Pitot and Colonel Bellechasse had consented to be the other executors. Between this period and the time he brought his last will to my house, Mr. Clark spoke very often of being engaged in making his last will; he always spoke of it in connection with his only and beloved daughter Myra, and said he was making it for her sake, to make her his sole heiress, and to insure her being educated according to his wishes. At the times Mr. Clark spoke of being engaged in making his last will, he told me over and over again what would constitute its contents; that he should in it acknowledge the said Myra as his legitimate daughter, and bequeath all his estate to her, but direct that an annuity of $2000 should be paid to his mother during

her life, and an annuity of $500 to a young female at the north of the United States, named Caroline Des Granges, till her majority, then it was to cease, and $5000 were to be paid her as a legacy; that his slave Lubin was to be freed, and a maintenance provided for him. He often spoke with earnestness of the moral benefit to his daughter Myra, from being acknowledged by him in his last will as his legitimate daughter, and of the happiness it would give his mother; he expressed the most extravagant pride and ambition for her; he would frequently use the emphatic language, that he was making her 'a bill of rights.' About four weeks before his death, Mr. Clark brought his will to my house; as he came in he said: 'Now my will is finished, my estate is secured to Myra beyond human contingency; now, if I die to-morrow, she will go forth to society, to my relations, to my mother, acknowledged by me in my last will as my legitimate daughter, and will be educated, according to my minutest wishes, under the superintendence of the Chevalier de la Croix, and her interests will be under the care of Chevalier de la Croix, Judge Pitot, and Colonel Bellechasse; here is the charter of her rights, it is now completely finished, and I have brought it to you to read.' He left it in my possession until the next day; I read it deliberately from beginning to end.

"After Mr. Clark's death, Colonel Bellechasse stopped at my house, and told me Mr. Clark's last will was suppressed, and that the old provisional will of 1811 was brought forward; he repeated what Mr. Baron and Lubin said (as he said) about the matter. Knowing well the unbounded confidence reposed in Lubin by Mr. Clark, I sent for him; he came and related to me what he said occurred soon after Mr. Clark's death. I understood that the notaries of New Orleans were summoned in court on the petition of Mr. Dusuau de la Croix, to swear whether they had a duplicate of Mr. Clark's last will. The late John Poultney, of New Orleans, deceased, came with several friends to examine an iron chest of Mr. Clark's that stood in my house, in the faint hope, as they said, of finding a duplicate of Mr. Clark's last will, that is, the will of 1813. This was immediately subsequently to Mr. Clark's death.

"Mr. Clark was a man of powerful and acknowledged talents, towering ambition, great pride and dignity of character, strong feelings and affections. The spectacle of such a man absorbed in one object that seemed to engage all his faculties, was of

itself highly impressive. To the excessive love for his child, all who were intimate with him could bear witness; but when he came to frame his last will, arrange his plans for her future aggrandizement, for her education, and embody principles and advice for her government through life, his wish and effort by means of his last will to carry himself beyond the grave, in all the relations as a parent to his sole and orphan child, these scenes are as vivid to my mind as if they had lately occurred."

Baron Boisfontaine testified, in the same manner, thus:

"Mr. Clark left at his death a daughter named Myra, whom he acknowledged as his own before and after her birth, and as long as he lived. In my presence he spoke of the necessary preparations for her birth, and asked my brother's wife to be present at her birth, and in my presence he proposed to my sister and brother-in-law, Mr. S. B. Davis, that they should take care of her after her birth. After her birth he acknowledged her to me as his own, constantly, and at various places. He was very fond of her, and seemed to take pleasure in talking to me about her.

"I was present at Mr. Clark's house about fifteen days before his death, when he took from a small black case a sealed packet, handed it to Chevalier de la Croix, and said, 'My last will is finished; it is in this sealed packet, with valuable papers; as you consented, I have made you in it tutor to my daughter. If any misfortune happens to me, will you do for her all you promised me? Will you take her at once from Davis? I have given her all my estate in my will, an annuity to my mother, and some legacies to friends. You, Pitot, and Bellechasse, are the executors.' About ten days before this, Mr. Clark, talking of Myra, said that his will was done. Previous to this he often told me, commencing about four months before his death, that he was making his last will. Two or three days before his death I came to see him on plantation business; he told me that he felt quite ill. I went to the plantation to set things in order, so that I might stay with him, and returned the same day and stayed with him constantly till he died. The day before he died, speaking of his daughter Myra, he told me that his last will was in his office-room below, in the little black case; that he would die contented, as he had insured his estate to her in the will. He mentioned his pleasure that he had made his

mother comfortable by an annuity in it, and remembered some friends by legacies. He told me how well satisfied he was that Chevalier de la Croix, Judge Pitot, and Bellechasse were executors in it, and Chevalier de la Croix Myra's tutor. About two hours before his death he showed strong feelings for said Myra, and told me that he wished his will to be taken to Chevalier de la Croix, as he was her tutor, as well as one of the executors in it; and just afterwards told Lubin, his confidential servant, to be sure, as soon as he died, to carry his little black case to Chevalier de la Croix. After this, and a very short time before Mr. Clark died, I saw Mr. —— take a bundle of keys from Mr. Clark's armoire, one of which I believe opened the little black case; I had seen Mr. Clark open it very often. After taking these keys from the armoire, Mr. —— went below. When I went below I did not see Mr. ——, and the office-room door was shut. Lubin told me that when Mr. —— went down with the keys from the armoire, he followed, saw him then, on getting down, go into the office-room, and that Mr. ——, on going into the office-room, locked the office-room door. I was with Mr. Clark when he died, and by him constantly for the last two days of his life. About two hours before he died he spoke of his last will and his daughter Myra in connection, and almost his last words were about her, and that his will must be taken care of on her account.

" When, after Mr. Clark's death, the disappearance of his last will was the subject of conversation, I related what he told me about his last will in his last sickness. Judge Pitot and John Lind* told me that they read it not many days before Mr. Clark's last sickness; that its contents corresponded with what Mr. Clark had told me about it; that when they read it it was finished, was dated, and signed by Mr. Clark; was an olographic will; was in Mr. Clark's handwriting; that in it he acknowledged the said Myra as his legitimate daughter, and bequeathed all his estate to her, gave an annuity to his mother, and legacies for some friends.

" The mother of Myra Clark was a lady of the Carriere family; not being present at any marriage, I can only declare it my belief that Mr. Clark was her husband. It was represented to me

---

\* A notary.

that this lady married Mr. Des Granges in good faith, but it was found out some time afterwards that he already had a living wife, when the lady separated from him. Mr. Clark, some time after this, married her at the North; when the time arrived for it to be made public, interested persons had produced a false state of things between them; and this lady, living in Philadelphia, and Mr. Clark not there, was persuaded by a lawyer employed, that her marriage with Mr. Clark was invalid, which believing, she married Monsieur Gardette. He frequently lamented to me that this barrier had been made, but that she was blameless. He said he would never give Myra a stepmother. He spoke to me of his daughter Myra from the first as legitimate; and when he made known to me that he was making his last will, he said to me he should declare her in it as his legitimate daughter. From the above I believe there was a marriage. The said Myra is the only child Mr. Clark ever acknowledged to me as his.

"From the time of said Myra's birth Mr. Clark treated me as a confidential friend, in matters relating to her and to his affairs generally."

The testimony of Bellechasse, in effect, was thus:

"Clark carried me with him on divers occasions to see Myra, and in my presence he manifested for her the most ardent love. He always gave me to understand, as well by reason of his extraordinary affection for said Myra, as by his positive declaration to that effect, that she would be the heiress of his fortune. In 1811, when he was about to make a visit to the North, in a formal act or deed of sale before a notary public, he conveyed to me some lots, perhaps fifty, as if I had paid the due price for them, when in truth nothing had been paid, for the sale was made with or under the confidential understanding that I should hold them for the sole use and benefit of said Myra, in the event of his death before his return. On his return I wished to reconvey them to him, but Clark would not allow me to do so, wishing, as I suppose, to give another proof of his confidence in my honor and rectitude, particularly as he, Clark, never wished to receive any written acknowledgment of the confidential nature of the sale. In 1813 he told me he was thinking of reducing to order his affairs, and of making his last will, so as

not to leave any longer exposed to risk the standing and fortune of his child, and that he wished me to consent to become one of his executors; I did so consent. He spoke of Judge Pitot and Chevalier de la Croix as persons whom he contemplated to have associated with him. He spoke with much reflection and deliberation of his being occupied in preparing his last will. On these occasions he spoke in the most impressive and emphatic manner of Myra as the object of his last will, and that he should in it declare her to be his legitimate child and heiress of all his estate, and he accordingly so made his last will. A very short time before the sickness that ended in his death, he conversed with us about her in the paternal and affectionate terms as theretofore; told us that he had completed and finished his last will. He thereupon took from a small black case his said last will, and gave it open to me and Judge Pitot to look at and examine. It was wholly written, dated, and signed, in his own handwriting. Pitot, De la Croix, and myself, were the executors. In it Myra was declared to be his legitimate daughter, and the heiress of all his estate. Some short time afterwards I called to see him, and learned from ―――― that he was sick in bed, too sick to be seen by me; however, indignant at an attempt to prevent me from seeing my friend, I pressed forward into his room. He took me by the hand, and with affectionate reprehension said, 'How is it, Bellechasse, that you have not come to see me before since my sickness? I told ―――― to send for you.' My answer was that I had received no message or account whatever of his sickness. I said further: 'My friend, you know that on various occasions I have been your physician, and on this occasion I wish to be again.' He looked at me and squeezed my hand. Fearful of oppressing him I retired, and told ―――― that I would remain to attend occasionally to Clark. ―――― said there was no occasion for it; that the doctor or doctors had ordered that he should be kept as quiet as possible. On ――――'s promising to send for me if there should appear to be any danger, I departed. On the next day, without receiving any message, I went and found Clark dead. I continued my way till I reached Pitot's, whom I found much affected by the death of Clark, and very indignant at the conduct of ――――, as well for having always prevented the assistance of Clark's friends, as for not having informed them (particularly him, Pitot, who lived near Clark), of his approaching dissolution, that by their presence the fraud-

ulent suppression of the last will of Clark might have been prevented. 'What!' I said, 'has Clark's last will disappeared?' 'Yes, my friend; it was not in the case in which he had placed it, and the succinct and provisional will of a dozen lines, which he previously made when about sailing for the North, and which he delivered to Relf, has been brought forward.'

"To fill my sacred duty towards Clark and his daughter, I wrote and sent her, many years before I saw her in Matanzas, in 1833, two letters, to Philadelphia. In these letters I informed her of the confidential trust held by me for her from her father, and of the fraudulent suppression of her father's last will, made in her favor; but neither of these letters, although sent by a safe conveyance, got into her hands, as she assured me afterwards in Matanzas. In that place I spoke at length with her and her husband of her rights, and of the cruel suppression of those rights. Since that time I have never seen them. On some occasions I wrote to them again, always assuring them of my friendly and almost paternal feelings towards the child of my old friend. I never heard Clark speak of having any other child besides the said Myra; I never heard him say that she was a natural child; I never heard him speak of any stain upon her, or her birth, but on the contrary he styled her in his will of 1813 his legitimate daughter; he told me that she was his only child.

"The last will of Clark, viz., his will of 1813, was legal in form. Few men were equal to Clark in talents and intelligence. He was well instructed in the principal matters that appertain to a gentleman and the proprietor of vast possessions; and the future happiness, fortune, and standing of his child were the objects dearest to his heart, and he satisfied himself that there was no obstacle to his bestowing his fortune upon her. Pitot, the judge of the Court of Probates at New Orleans, was one of the executors in Clark's last will, viz., that of 1813. He examined it after it was finished, and he should have known whether it was legal in form and in its provisions. Few lawyers in Louisiana were better acquainted with the laws than Clark; and had he not been, he numbered among his intimate friends some of the ablest lawyers of that State, and he was the last man to neglect any means necessary to accomplish an object which he was so intent upon."

Dusuau de la Croix, already mentioned as having, in 1813, caused the notaries of New Orleans to be summoned to see if no will of 1813 existed, now, A. D. 1834, testified in substance, thus:

That he was very intimate with Clark, for a great many years, and up to the time of his death; that some few months previous to this event, Clark visited him, and expressed a wish that he, the deponent, should become his executor. In this conversation Clark spoke of a young female, named Myra; he expressed a wish that the deponent should become tutor to this female, and that she should be sent to France for her education, and said that he, Clark, would leave her a sufficient fortune to do away with the stain of her birth; that a month or two after this, the deponent called to see Clark at his house, and found him in his cabinet; he had just sealed up a packet. The superscription on it was as follows: "To be opened in case of death." Clark threw it down in the presence of deponent, and told him that it contained his last will, and some other papers which would be of service. The deponent did not see the will, nor does he know anything about its contents; he only saw the package with the superscription on it.*

In this conversation Clark observed that he had named R. Relf and B. Chew as his executors in a former will.

On this and other evidence of its specific contents, the will thus lost or destroyed and sworn to, was finally, on the 18th of February, 1856, received by the Supreme Court of Louisiana as the last will of Daniel Clark; reserving to Relf (the surviving executor of the former one) the right, "if he have any, to oppose the will in any manner allowed

---

* This testimony of De la Croix is commented on by the court, *infra*, Gaines *v.* De la Croix, p. 721, and in so far as it goes to militate against the will of 1813, discredited. It seemed that when the notaries answered that no will of Clark was in their possession, De la Croix, assuming that none existed, or could be proved, made purchases of slaves from Relf, acting executor of the will of 1811. Suit was now brought against him for their value. He thus had a direct interest to support the will of 1811, as against that of 1813. What he said in favor of the existence of the will of 1813 was an admission against himself; while his declaration that he knew nothing of its contents was not allowed to impair the value of the testimony of other witnesses who swore to their nature.

by law as fully as he could have done had he not been a party to these proceedings."

The will now established contained these clauses:

"I do hereby *acknowledge* that my beloved Myra, who is now living in the family of Samuel B. Davis, is my *legitimate* and *only* daughter; and that I leave and bequeath unto her, the said Myra, all the estate, whether real or personal, of which I may die possessed, subject only to the payment of certain legacies hereinafter named."

\* 　 \* 　 \* 　 \* 　 \* 　 \* 　 \* 　 \* 　 \*

"I further give and bequeath an annuity of five hundred dollars to Caroline Des Granges, until she arrives at the age of majority; after which, I give and bequeath her a legacy of five thousand dollars."

But the establishment of this will did not end the matter. By the law of Louisiana, it is not allowed to a testator to make devises to his adulterine bastard. The question of a marriage ceremony performed between Clark and Zulime became, therefore, a matter of primary importance. Had any marriage ceremony been performed between them before the birth of Myra? There were evidences on both sides.

I. AGAINST such a conclusion were supposed to be:

1. The fact, in connection with Clark's special character, of the different social positions and reputation of the parties; the fact that the first child was, in reality, illegitimate, and was known to be so at least by Mr. Coxe; and that in New Orleans, a place, at this time, of a few thousand inhabitants, and where he was himself the most conspicuous and best known person in it—a leader of party there—he was looked upon by the community generally to be an unmarried man.

Thus one witness—Cavillier, a merchant in New Orleans—after stating that he was long and intimately acquainted with Clark, said:

"I never knew him as a married man; I never heard of his being married; I always knew him as a bachelor. . . . He was

considered as the lover of Mrs. Des Granges; was considered an honest man, a man of good reputation. It is for that very reason that I think he was never married to that woman, because he well knew her conduct, and was himself a man of delicacy of feeling."

So Julien Domingon, another witness:

" I am sixty-one years of age. I have lived in New Orleans forty-five years. I knew Clark as well as a young man of fifteen years and some months could know a man of about forty years. I first knew him in 1804. I always thought he was a single man. He was much before the public in those days; his character was much discussed in the public papers. It was never rumored or said, in public, that he was married. He had the reputation of having several mistresses. I do not recollect that at that time Madame Des Granges was reputed to be his mistress."·

Mr. W. W. Montgomery:

" He was always considered a bachelor by his friends and acquaintances in general. I never heard him spoken of in New Orleans as a married man during his lifetime. He was a high-minded, honorable man. I do not believe that he was capable of addressing a young lady with a view to marriage if, at the same time, he had been, in truth, a married man. He had too much honor."

J. Courcelle said:

" Clark was never married, so far as I know. I have said that he was never married, because the population was so small that we knew everything that took place. 1 knew Madame Des Granges. I have been in certain circles where her reputation was spoken of lightly; *but I cannot give any positive testimony* about it. She was very *coquette et legere.*"

Mr. Charles Harrod:

" I have always heard him speak of himself as a bachelor, and we frequently joked with him about a lady in Baltimore, whom we supposed he was going to marry. Frequently, when dining together, we conversed on such subjects, and the course of conversation was that of bachelors; it led me always to believe he

was a bachelor.  I think he was considered a bachelor by the community of New Orleans."

E. Carraby:

"Clark and Madame Des Granges lived together in an illicit connection.  I mean, this was the general report.  Her reputation was known enough not to have been misunderstood by Clark.  Mr. Clark was a too high-minded man to contract marriage with his paramour."

Mrs. Julia Wood:

"I lived in Mr. Relf's house when Clark lived there also.  My conviction on this subject results from my intimate knowledge of him; and I know that he was not married as certainly as I know any other negative fact.  I ought to add, that his peculiar tone and style of character was such that he would have been one of the very last men on earth to marry clandestinely, or to marry any woman whose social position was not in all respects equal to his own, or whose personal character was not of the highest order."

P. J. Tricou:

"She was considered as the *amante* of Clark."

J. B. Dejan:

"Was well acquainted with Clark from 1797 up to the time of his death in 1813.  He stood high in the opinion of all the respectable families of New Orleans.  He was a single man.  I never heard from any person, up to the time of his death, that he was a married man."

Jean Canon:

"Knew Clark intimately.  He never told me he was married. I always forbore questioning him about Madame Des Granges. Their connection was kept very secret.  Clark kept such things concealed as much as possible; as he had several such connections, and it would have given him trouble had his particular female friends known them.  Whenever he spoke of her, he spoke of her as a beautiful woman, and deservedly, for she really was a beautiful woman.  When Clark saw a pretty woman he fell in love with her."

Mr. Hulings, an intimate acquaintance:

"I firmly believe Clark was never married."

Mrs. Hulings:

"It was as perfectly understood that Mr. Clark was an unmarried man as that Relf and Chew were married men."

D. W. Coxe, the partner of Clark:

"My personal relations with Daniel Clark, in the years 1802 and 1803, were of the most intimate and confidential character. I do not believe it possible that Daniel Clark, standing in the business and personal relationship of unlimited cordial confidence which he did to me, would have been married in the city of Philadelphia, or anywhere else where I was, at the time mentioned in the interrogatory, without his informing me of it, and inviting me to the wedding. Such a thing is, of course, possible, but I can imagine few events in life less probable."

Coxe further testified, that when Zulime was in Philadelphia, just before her marriage with Mr. Gardette, she told him "she had heard that Mr. Clark was going to be married to Miss ——, of Baltimore, which she complained was a violation of *his promise* to marry her."

2. In all of the public and notarial acts signed by Daniel Clark, he represented himself as a single man.

3. His relations regarded him as unmarried. Thus his mother in her will so speaks of him; and on the representations of Mr. Coxe and others that they were so, makes provision for both his "natural" children.

4. He declared himself (*a*) by words and (*b*) conduct, unmarried.

(*a*) In 1806 his sister writes to him in regard to a "toilet" which he had bought in London:

LIVERPOOL, May 3d, 1806.

MY DEAR BROTHER:

I scarcely know whether you will be obliged to me, or not, for the share I had in fitting up your truly elegant toilet, but the idea of its being intended for Mrs. D. Clark got strong possession of my mind, and so much do I wish to see one bear

that name worthy of you, that nothing in my opinion would be too good to trust in it.  I cannot think how the plan of such a thing could enter into your head, for I assure you it has been exhibited in London as a masterpiece of elegance and fashion. Do pray write soon to me; you cannot think how uneasy I made myself when I heard you went to Vera Cruz.  Why will you be forever toiling?  Surely you should now sit down and enjoy life.  Let me know if my suspicions are right about the destination of the toilet.  If they are, may you be as happy in your choice as your affectionate sister,

JANE GREEN.

DANIEL CLARK, ESQ., New Orleans.

Clark replies to her:

NEW ORLEANS, 14th October, 1806.

MY DEAR SISTER:

I have received your letter of the 3d May, and thank you kindly for the pains you took in filling the toilet.  I assure you that it would have given me infinite pleasure to have offered it either to Mrs. Clark, or any person likely to become Mrs. Clark; but this will not be the case for some time to come, for as long as I have the misfortune to be hampered with business, so long will I remain single for fear of misfortune or accident.

DANIEL CLARK.

(*b*) *He addressed other ladies.*  The matter has been already spoken of in regard to Miss ——, in the year 1808.  So it was testified by a female witness, that Clark " paid his addresses and was engaged to Madame —— (sister of the witness), up to the time of his death; that the courtship began about a year before Clark's death; that the engagement took place about eight months before; that the marriage was delayed, from causes which the witness did not particularly understand, from time to time, and was to have been celebrated within about two months, when it was put an end to by the death of Clark.  The witness stated that she had never heard any cause assigned why the marriage was not celebrated immediately after the engagement; that her sister had been divorced; and, finally, in 1815, and after Clark's

death, that she was reunited by civil contract to the same man from whom she had been separated."

5. He suffered another man to possess Zulime as a wife.

On the matters presented in these two last heads, Mr. Coxe said on cross-examination:

"Daniel Clark was a high-tempered and chivalrous man, and his disposition was quick and impetuous. I have known no man who would have more promptly resented an imputation against his honor or integrity. I can express most decided belief that he would not have submitted to the indignity of allowing a man to take from him his wife, if he had any, and appropriating her to himself.

"I can express, also, a decided opinion upon the other point inquired of, and it is this: That I am perfectly sure, that if Daniel Clark had been in truth a married man (whether that marriage had been public or private), and his wife still living, he would never have held himself out to the community and the social circles in which he moved, directly or indirectly, as an unmarried man. I am equally sure, that in the case supposed he would never have approached a lady with overtures of marriage, nor would he have announced to his friend an intention of addressing a young lady with a view to marriage. There ought to have been no doubt upon the mind of any man who knew anything of Daniel Clark on this subject, that he would neither have been guilty, or even conceived, of acts so atrocious."

6. So it appeared that on the 30th November, 1805, Zulime, by her attorney, one "Eligius Fromentin," reciting "An act concerning alimony," &c., and that it was provided in it "that the county court shall have jurisdiction on applications from wives against their husbands for alimony on their husbands deserting his wife for one year successively, and in cases of cruel, inhuman, and barbarous treatment," and that she had been so treated "by Jerome Des Granges her husband," and "likewise deserted by him for three years past, to wit, from the second day of September, 1802, even unto this day, although she has been told that the said Jerome Des Granges returned from France to New Orleans some time in the course of last month, and is now in the city of New Or-

leans," petitioned the county court of New Orleans to condemn the said Des Granges "your petitioner's husband," to pay her alimony for her support, at the rate of $500 per annum. To this petition Des Granges never appeared, and judgment went against him by default.

7. So too it appeared that in June, 1817, application was made in behalf of the child, by the law firm of Davis & Pierce there,—Davis being a son of Col. Davis,—to the District Court of New Orleans, for alimony. The petition was entitled, " Myra Clark and her curator *ad litem*, S. B. Davis, *v.* B. Chew and R. Relf, executors of Daniel Clark, deceased," and sets forth that Myra Clark, 13 years of age, was "the *natural daughter* of Daniel Clark," acknowledged by him as such, and entitled to "*alimony*," from his estate. It further stated that " the petitioner had heard that some instrument was executed by her said father making some provision for her, and concluded with a prayer that the executors produce all papers relating to her," &c. This petition was withdrawn soon after being filed, in consequence, as it seemed, of an assurance from either Mr. Relf or Mr. Chew " that they would do all that was right if they could have a little time and that it was not worth while to have a suit about it."

8. Mr. Coxe stated that some years before the one when he was now speaking (1849), having heard much of the will of 1813, and also that the late Stephen Mazureau, then a distinguished lawyer of New Orleans, was cognizant of certain matters connected therewith, and having in February, 1842, conversed with Mr. Mazureau on the subject, and being, as he testified, desirous not to rely on his own recollections of what Mazureau said, he had addressed Mazureau a letter, and that Mazureau's reply—which was annexed to Coxe's deposition—was as follows:

NEW ORLEANS, May 1st, 1842.

SIR: In the conversation with you in February last, I mentioned, in reply to your inquiries, that the late Daniel Clark once consulted me and the late Edward Livingston, Esq.,—not "to ascertain whether he could make some provision by will for

Statement of the case.

Myra, his supposed illegitimate daughter,"—but whether a cer-
tain will, of which he showed me a rough sketch, would be valid
in law in this then Territory. The will thus intended to be
made, stated Myra to be his natural child, and instituted her his
universal heir, leaving to his own mother an annual rent of, I
believe, $3000. Upon asking Mr. Clark what the name of the
girl's mother was, he answered me: "You know the lady, it is
Madame Des Granges." "But that woman was married, and
Des Granges was alive when the girl was born. I recollect hav-
ing heard a great deal of talk about it at the time, but never
heard your name mentioned as connected with that love affair."
"Yes," said Clark, "she was married, I know; and what mat-
ters it? The ruffian (who kept a confectionery-shop here) had
deceived that pretty woman; he was married when he courted
her and became her husband, and, as it was reported, he ran
away afterwards from fear of being prosecuted. So, you see,
this marriage was null." "That may be, but, until so declared
by a competent tribunal, the marriage exists, and the child is
of such a class of bastards* as not to be capable by our laws of
receiving by will, from her supposed father, anything beyond
what may be necessary for her sustenance and education. Such
are the positive provisions of our code. The Spanish laws were
somewhat more favorable. They permitted the father to leave
to such a child one-fifth of the whole of his estate, but our code
has restricted that to mere alimony."

I showed Clark both our codes and the Spanish laws, and,
though apparently disappointed, he expressed his satisfaction
that he could not make the will he intended to make. I went
further, and showed him the girl could not be legitimated or
even acknowledged as his child, by subsequent marriage or
otherwise. I showed him, also, that if his mother survived
him, she was his forced heir, and that in supposing that he could
leave to the child anything beyond what is necessary for her
sustenance, it could not be of the value of more than one-third
of his estate, as his mother was entitled to take and receive two-
thirds clear of all charges or dispositions.

"What shall I do, then?" asked Mr. Clark. "Sir, if you have
friends in whom you can place your confidence—you probably

* An adulterous bastard.

have some—convey them secretly some of your property, or give them money for the use of the child, to be given to her by them when she becomes of age." "That I'll do," said Clark, and we separated.

I heard afterwards from him, and from Mr. Bellechasse, that he, Clark, had done what he told me he would do.

\*　　\*　　\*　　\*　　\*　　\*　　\*

As this is written in haste, I would not like it to meet the eye of the public, though every particle of it is most substantially true.

I remain, with great respect, sir,

Your obedient servant,

MAZUREAU

D. W. COXE.

Mr. Mazureau had not apparently been called as a witness to prove the facts stated in his letter.

9. If any marriage had been solemnized, it was at Philadelphia, and as primarily testified by the only witness who swore to being at it, in the year 1803, though in one deposition she said it was perhaps in 1802. None other was set up. Yet it seemed that in 1803 Clark had not been in Philadelphia; and that he was there in 1802 only at and near the time when he had sent Zulime to be delivered of Caroline, a circumstance, which, as the reader will, perhaps, see hereafter, the testimony to prove the marriage appeared rather to separate from the date of that event.

On the subject of Clark's presence in that city, in the years 1802 and 1803, the testimony was thus:

A letter from Clarke to Chew & Relf, dated Philadelphia, 18th February, 1802, said:

"I *returned* three or four days from Washington, where I had an opportunity of seeing the President and officers of government, by whom I was well received. . . . It has been hinted to me that a great deal is expected from my services."

How long he had staid at Washington, except by the expressions quoted, did not appear; nor when he first arrived in Philadelphia before going to Washington.

Mr. Coxe—having stated that Clark had sent Madame

Des Granges to him in an advanced state of pregnancy, and that she had been delivered under his care, as Clark's friend —testified, at different times, to this effect:

Clark arrived in Philadelphia within a very short time after the birth of Caroline, which was, I believe, in April, 1802. I then received from him the expression of his wishes in reference to the child. At this time he left with me a power of attorney, which is annexed, and to which I refer.* Immediately thereafter he left for New Orleans, and arrived in Philadelphia again, in a vessel from New Orleans, during the last days of July, 1802. He was at Wilmington, below this city, on the 22d of July, 1802, as will be seen by his annexed letter to me of that date.† He had pressing business of great magnitude, which occupied his entire time during his stay in Philadelphia. My impression is that I saw him every day during his stay in Philadelphia. On his arrival in Philadelphia he commenced making preparations for an immediate departure for Europe, on business of importance; and left the city in a few days for New York, from whence he sailed for Europe in a very short time; I am quite certain, previous to the middle of August, 1802.‡ He remained in Europe until, I think, the latter days of November, 1802, at which time he sailed directly from Europe to New Orleans, where he arrived, as I understood, in the last days of February, 1803; the vessel having put into Kingston, Jamaica, from some cause, which caused her to make a longer passage. He was not in Philadelphia at any time during the year 1803, to my knowledge; and I believe

---

* This power, executed by Clark at Philadelphia, was dated 22d April, 1802. It had no reference to the child.

† This document was annexed to testimony taken in the case. A letter of Clark, dated "Plaquemines, Sunday, 27th June, 1802," speaks of himself as hoping "to-morrow to get to sea."

‡ An original letter from Coxe to Relf & Chew, dated August 6th, 1802, produced, said:

"Mr. Clark wrote you very fully per mail some days since; since when he has come up to Germantown, and to-morrow sets out for New York, there to embark for England."

A letter from Clark to them, New York, 17th August, 1802, mentions his being about to sail "to-morrow."

In an original letter from Clark, in Liverpool, dated 7th October, 1802, he speaks of himself as having been there three days.

if he had been I would have known it. It could scarcely have been otherwise. As to the time of his arrival in New Orleans, I refer to the letter annexed.* . . . The occasion of his visit to Europe was urgent business connected with our commercial transactions, making it necessary that he should arrange certain business matters with our mercantile friends in that country, rendering it necessary for us to know the existing and probable future political state of England and the continent generally.

Coxe, as already mentioned, testified that he knew nothing whatever about any marriage, and wholly disbelieved that any had ever taken place.†

II. ON THE OTHER HAND were various testimonies relied on to prove a marriage; as—

1. The acknowledgment and declaration, testamentary and oral, of the child's legitimacy, already mentioned in the history of the will of 1813.

2. Positive testimony given in 1849, by one witness, Madame Sophie Despau, the sister of Zulime, to the *fact* of marriage. The testimony ran thus:

"I do know that Daniel Clark was married. He was married in Philadelphia, by a Catholic priest, to my sister Zulime. I was present at this marriage. This, to the best of my recollection, was in the year 1803; although there are some associations in my memory which make me think it not improbable

---

* This letter, dated 31st January, 1807, was one from Clark to Coxe, giving an account of a particular transaction, and in which he says: "When I returned from Europe, in the beginning of the year 1803, . . . the French making immediate preparations to take possession of Louisiana," &c. Other letters were produced, two addressed to him at New Orleans, April 18th, and May 27th, 1803; others from himself, dated New Orleans, 8th June, 13th July, 21st July, 18th August, 6th October, 1803, showing Clark's presence there then, and others from Mr. Jefferson and Mr. Madison to him during the same year; the last dated 31st October, 1803. This last letter pointed plainly to the critical condition of things at that time in Louisiana, and to the reliance had on Clark by the Federal government, in case of "a *coup de main*." There were also letters to Clark at New Orleans from Coxe, dated November 18th, and December 23d, 1803.

† See his testimony, *supra*, p. 672.

that the marriage may have taken place in the year 1802.* My impression, however, is, that the marriage took place in 1803. It was, I remember, a short while previous to Mr. Clark's going to Europe.† There was one child, and to the best of my knowledge and belief, only one child, born of this marriage, to wit, Myra. The circumstances attending the said marriage, were these : Zulime had previously been married to a man named Des Granges, with whom she lived several years, until she heard that he had another living wife at the time of his marriage with her. This information, confirmed by the subsequent admissions of Des Granges himself, led to a separation, when Zulime returned to her family. These circumstances were known to the public. While thus residing with her family, Mr. Clark made proposals of marriage with her. These proposals were made with the full knowledge of all the family. But it was considered essential, before any marriage could take place, that record proof of the invalidity of her marriage with Des Granges should be first obtained. To obtain this proof from the records of the Catholic church in New York, where Des Granges' prior marriage was celebrated, my sister and myself embarked for that city. It was agreed and understood that Mr. Clark should follow after us. On our arrival in New York, we learned that the registry of marriages of which we were in search had, in some way, been destroyed. Mr. Clark arrived after us. We were told that a Mr. Gardette, then living in Philadelphia, was one of the witnesses to Des Granges' prior marriage. We proceeded to Philadelphia, and found Mr. Gardette, who told us that he was present at said prior marriage of Des Granges; that he afterwards knew Des Granges and his wife by this marriage; and that this wife had gone to France. Mr. Clark then said to my sister, 'You have no longer any reason to refuse being married to me. It will, however, be necessary to keep our marriage secret until I have obtained judicial proof of the nullity of your

---

* The year of the alleged marriage as given in the text, is that given by Madame Despau, in a deposition of 1849. In a deposition taken in 1845, now offered by the defendants to contradict and discredit her, and, in connection with a deposition of her sister, who stated that same year (while both stated that they had personal knowledge of Caroline's birth and Madame Despau that she was born in 1801), to show conspiracy between the two sisters, she stated that the marriage was " in 1803."

† For the date of this voyage, see *supra*, p. 678, and notes.

marriage with Des Granges?' They, the said Zulime and the said Clark, were then married. Soon afterwards, our sister, Madame Caillavet, wrote to us from New Orleans, that Des Granges' former wife (the one he had at the time of marrying with Zulime) had arrived at New Orleans. We hastened our return to New Orleans, where Des Granges was prosecuted for bigamy.* Father Antoine, of the Catholic church in New Orleans, took part in the proceedings against him. Mr. Des Granges was condemned for bigamy in marrying the said Zulime, and was cast into prison, from whence he secretly escaped by connivance of the governor, as it was understood, and was taken down the Mississippi River by Mr. Le Brenton D'Orgenois, where he got to a vessel and escaped from the country. This happened not a great while before the cessation of the Spanish government in Louisiana. Mr. Clark told us that before he could promulgate his marriage with my sister, it would be necessary that there should be brought by her an action against the name of Des Granges. The change of government, which took place about that time, created delay; but at length, in 1806, Messrs. Brown and Fromentin, as the counsel of my sister, brought suit against Des Granges, in, I think, the City Court of New Orleans. The grounds of said suit were, that Des Granges had imposed himself upon her in marriage at a time when he had a lawful living wife. Judgment in said suit was rendered against Des Granges. But Mr. Clark still continued to defer promulgating his marriage with my sister, which very much fretted and irritated her feelings. While he was in Congress, my sister heard that he was courting Miss —— ——, of Baltimore. She was distressed, though she could not believe the report, knowing her-

* In the deposition of 1845, Madame Caillavet said thus:

"The circumstances of her marriage with Daniel Clark were these: Several years after her marriage with Mr. Des Granges, she heard that he had a living wife. Our family charged him with the crime of bigamy in marrying the said Zulime. He at first denied it, but afterwards admitted it, and fled from the country. These circumstances became public, and Mr. Clark made proposals of marriage to my sister, with the knowledge of all our family. It was considered essential first to obtain record proof of Des Granges having a living wife at the time he married my sister; to obtain which, from the records of the Catholic church in New York, we sailed for that city." [She then describes the visit to New York and Philadelphia, and marriage there as in the text.] "Soon afterwards our sister, Madame Caillavet, wrote to us from New Orleans that Des Granges' wife, whom he had married prior to marrying the said Zulime, had arrived at New Orleans. We hastened our return to New Orleans. He was prosecuted for bigamy," &c.

self to be his wife.  Still, his strange conduct in deferring to promulgate his marriage with her had alarmed her, and she and I sailed to Philadelphia to get the proof of his marriage with my sister.  We could find no record of the marriage, and were told that the priest who married her and Mr. Clark was gone to Ireland.  My sister then sent for Mr. D. W. Coxe and mentioned to him the rumor above stated.  He answered that he knew it to be true that Mr. Clark was engaged to the lady in question.  My sister replied that it could not be so.  He then told her that she would not be able to establish her marriage with Mr. Clark, if he were disposed to contest it.  He advised her to take the advice of legal counsel, and said he would send one.  A Mr. Smith came, and, after telling my sister that she could not legally establish her marriage with Mr. Clark, pretended to read to her a letter in English (a language then unknown to my sister), from Mr. Clark to Mr. Coxe, stating that he was about to marry Miss ——.  The marriage between Mr. Clark and my sister was a private one.  Besides myself, there was present at the marriage a Mr. Dorsier, of New Orleans, an Irish gentleman, a friend of Mr. Clark's, from New York, whose name I do not recollect.  Mr. Clark told me in his lifetime that he had informed Colonel Davis, Mr. Coxe, and Mr. Relf, of this marriage.  It was known only to a few friends.  By the marriage of my sister with Mr. Des Granges there was born two children, a boy and a girl.  The boy died.  The girl lived, and was named Caroline.*  She afterwards married a physician named Barnes.  She was born in the year 1801.  The marriage was privately celebrated at a house in Philadelphia, rented by Mr. Clark for my sister, but I am unable to remember the name of the street on which it was situated, or of the priest who officiated.  The great lapse of time which has taken place since these events, renders it impossible for me to answer with the precision the question demands.  As well as I can remember, it was in one of the early months of spring, in 1802 or 1803.

---

* In another deposition, this witness, after stating that Caroline was Des Granges' child, testified about her thus:

"*Since* the death of Mr. Clark, Mr. D. W. Coxe and Mr. Hulings, of Philadelphia, gave her the name of Caroline *Clark*, and took her to Mr. Clark's mother, and introduced her as the daughter of her son.  She, of course, believed their story, which induced her, in her will, to leave a portion of her property to Caroline.  Caroline was born in 1801.  I was present at her birth.'

Mr. Clark was several weeks in Philadelphia before the marriage. I did not know, or cannot now remember, where he lived during that time. We stopped first at a boarding-house kept by an American lady, I think a widow, whose name I cannot remember. We were in Philadelphia but a short time previous to the marriage. My sister was about nineteen or twenty years old at the time of her marriage with Mr. Clark. After the marriage we resided together in the house provided for my sister, as I have already stated.

"I have stated fully my recollection of all that concerns the marriage. Not a great while after the marriage, Mr. Clark set out for Europe. Soon after his departure, in consequence of information received from our sister, Madame Caillavet, at New Orleans, in regard to the arrival there of the first wife of Des Granges, we set out for that city. We arrived there, I think, in the summer. I do not remember the precise time of Mr. Clark's arrival there, but it was afterwards. It is impossible for me to recollect with certainty the precise time occupied by each one of so many events that happened so many years ago.

"Mr. Clark furnished my sister with a handsome house in New Orleans, in which she and I resided together, and where he frequently visited my sister, taking his tea with us almost every evening. This house was situated on a corner, and, I think, near what was then called the Bayou Road; but I cannot recall the name of the street, or fix with certainty the precise locality.

"Mr. Clark enjoyed throughout Louisiana, as far as my knowledge extended, the character of a highly honorable man. He had great pride of character, and was as quick to resent and punish any personal indignity as any man I have known. I have always believed that his feelings and purposes towards my sister were sincere and honorable, and that he would have proven this by giving her her true position before the world as his lawful wife, if it had not been for the unfortunate state of feeling that was produced between them. I do not believe he was a man to impose designedly upon any one, or to suffer it to be done where he was concerned. What would have been his course in the matter if he had been apprised of the contemplated marriage between her and Gardette, it is impossible for me to say. My sister has told me, that in an interview had with him in Philadelphia, after the marriage with Mr. Gardette, he ex-

pressed the deepest regret that that barrier had been placed
between them; stating that he had become thoroughly satisfied
that things he had heard in regard to her, and which had in-
fluenced him to postpone the promulgation of his marriage with
her, were calumnies; that he acquitted her of all blame; and
that but for the marriage with Gardette, he would then have
claimed and recognized her before the world as his wife.

" It was the misfortune of my sister, only a girl of thirteen,
to be deceived in her first marriage with Mr. Des Granges, who,
as I before stated, was a married man at the time he married
my sister.  Being satisfied that she had been imposed upon by
Mr. Des Granges, and was no longer his wife, she married Mr.
Clark.  Had it not been for the interested wickedness of Mr.
Coxe, in assuring her, and employing counsel to aid him in mis-
representing to her, that her marriage with Mr. Clark was ille-
gal, she never would have married Mr. Gardette.  It was the
misfortune of my sister to have been deceived by those whose
duty it was to protect her, and it is my firm belief, that neither
in the eye of God nor highly honorable men or women, will she
be condemned; but, on the contrary, be pitied for her unprece-
dented afflictions."

3. To the same general purpose was the testimony of an-
other sister, Madame Rose Caillavet, taken in 1849, at the
age of 83:

" I was not present at the marriage of my sister with Mr
Clark; but it is within my knowledge, both from information
derived from my sisters at the time, and from the statements of
Mr. Clark, made to me during his lifetime, that a marriage was
solemnized between them.  It is to my personal knowledge that
Mr. Clark, about the year 1802 or 3, made proposals of marriage
with my sister Zulime, with the knowledge of all our family.
They were discussed, and the preliminaries of the marriage
arranged by my husband, in his house, in my presence.  But my
sister, having been previously married to one Des Granges, who
was found to have had a lawful wife living at the time of his
marriage with her, the marriage of Mr. Clark could not take
place until proofs of the invalidity of her marriage with Des
Granges were obtained.  To procure these proofs from public
records, my sisters, Zulime and Madame Despau, went to the

north of the United States, where Des Granges' prior marriage was said to have taken place. While there, my sister Zulime wrote to me that she and Mr. Clark were married.* I have always understood that the marriage between my sister and Mr. Clark was a private one, and that it was not promulgated by Mr. Clark in his lifetime, unless he did so in a last will made a short time previous to his death. Mr. Clark stated to me frequently that Myra was his lawful and only child.

"Some years after my sister's marriage with Mr. Des Granges, it became known in New Orleans that he had a prior wife living. My sister immediately separated herself from him, and came to reside with her family. At a later period, Mr. Des Granges was prosecuted, found guilty of bigamy in having married my sister Zulime, and cast into prison. I did not know the first wife of Des Granges, but it is within my knowledge that she came to New Orleans, and while there fully established her pretensions as his lawful wife."

---

* This deposition of Madame Caillavet was taken, as above said, in 1849. In it the witness said that she desired to state as she now did, under the solemnities of her oath, that a certain deposition of hers taken in 1835 was, as it had been translated to her from the English copy filed, in very material parts a garbled and mistranslated statement of what she had really said. She had mentioned in this deposition that while Zulime and Madame Despau were at Philadelphia, "Des Granges returned from France, and at the same time or a very short time after his first wife made her appearance." The deposition proceeded; the italicized part being the part which she stated was a misconception of what she had said:

"Upon this, witness immediately apprised her sister of this fact, and she returned immediately to New Orleans. On the arrival of the said first wife of Des Granges, she complained to the governor, who caused Des Granges to be arrested.(it was under the Spanish government); after some time, he obtained his release, and left the country. Before his departure, he confessed that he had previously married. Witness understood *afterwards* from her sister, by letters which she received from her secretly, that she was married with Mr. Daniel Clark. The preliminaries of the contemplated marriage were settled by the husband of witness, at his house, in the year 1802 or 1803, in the presence of witness.

"Cross-examination: *When her sister wrote to her about her marriage with Daniel Clark, she informed her afterwards that she had had a child (a daughter) by that marriage, who, she understood, was called Myra.*"

The witness, in making the correction, stated that "the information of witness, so far as derived from her sister in regard to the said marriage with Daniel Clark, was derived at the time the event took place."

The same witness, examined in 1845, said:

" Mr. Clark's marriage with my sister Zulime was after the detection of Des Granges' bigamy. The birth of their daughter, Myra Clark, was some years after the marriage. I was not present at the marriage of my sister with Mr. Clark. I believe they were married, because my sister wrote me from Philadelphia that she was married to Mr. Clark; Mr. Clark also told me the same on his arrival at New Orleans. They were married at Philadelphia. Not being in that city at the time, I am unable to answer the numerous questions on that subject.* I first saw Mr. Clark, I think, in the year 1802. I was introduced to him by Mr. Dosier, of Louisiana. My sister, after her marriage with Mr. Clark, arrived at New Orleans, accompanied only by her sister, Madame Despau. She was married to Mr. Clark as Miss Zulime de Carriere, *in the year* 1803; I do not remember the month; I do not remember the season of the year that Mr. Clark returned to New Orleans; she did not accompany him. I very frequently saw Daniel Clark after his marriage with my sister; as the marriage was a private one, it was not advisable that they should reside in the same house; he, however, provided her with all the elegancies of life, and was devoted to his wife and child."

4. Bellechasse, also (already mentioned):

" I cannot swear that Clark was married to Miss Carriere, the mother of his child, although many persons affirmed that such was the fact; but I am well assured that, if he was not married to her, he was never married to any other woman."

5. In regard to the petition presented by the law firm of Davis & Pierce, as at the suit of Myra Clark, Colonel Davis testified that if it contained such words, as "that the petitioner, Myra, was the natural daughter of Daniel Clark, late of the city of New Orleans, deceased, acknowledged by him

---

* In other depositions of the same witness (which were relied on by the defendants to prove falsehood in her), Madame Caillavet stated that the birth of both Des Granges' children (one being specified as "Caroline"), was " *well* known to her of her *personal* knowledge."

as such," or words to that effect, they were never made use of with or by his knowledge or consent.

6. The fact, that while several persons *supposed* that they each possessed Clark's entire confidence about all his domestic concerns, it was now evident that they possessed it only in relation to single, separated, and particular parts or items of them; and that on other things, even of a kindred kind to those which they knew much or all about, he kept his confidences habitually and closely locked up from them. Why not then about a marriage meant to be a secret one, supposing such a marriage to have been performed?

Thus the testimony showed conclusively, that his most intimate friends in New Orleans, Boisfontaine and Belle-chasse, both of whom knew all about Myra there, knew nothing whatever about Caroline in Philadelphia. Baron Boisfontaine testified:

"From the time of Myra's birth, Mr. Clark treated me as his confidential friend, in matters relating to her and to his *affairs generally*. The said Myra is the *only* child he ever acknowledged to me as his."

So Colonel Bellechasse:

"I never heard Clark speak of having any other child beside Myra. He told me that she was his *only* child."

On the other hand, his partner Coxe, in Philadelphia, with whom he was undoubtedly most intimate, and who knew all about Caroline, knew nothing whatever about the history of Myra, living, after 1812, in the same city with him; and with difficulty would believe that she was a child of Clark's at all, or of anybody except Colonel and Mrs. Davis. He thus testified:

"Daniel Clark had not to my knowledge any other child be sides Caroline. He never acknowledged any such child to me. My intimacy with him would have justified, and would have been likely to induce, such a disclosure to me, if there had been any such child or children. Such, at least, is my belief, *though in some respects Mr. Clark was a man of very peculiar character.*

After his death, I was informed by Dr. Hulings and S. B. Davis, for the first time, that he had another daughter by Madame Des Granges, born in New Orleans, called Myra."

So in February, 1802, a date very near (either before or after) to the birth of Caroline, Clark, having just returned from Washington, and being then in Philadelphia, where Zulime and her sister were, writes on the 18th of that month to Chew & Relf:

"When you write to me on private matters, let your letters come direct to Mr. Earle, as things will often occur which I wish only to see. . . . Forward me the $2000 which I wrote to you for in one or two good bills, that I may have some funds at my own disposal, without calling on Mr. Coxe for trifles, as I may want money. This must be a business kept to yourself."

III. The testimony of Colonel Davis, now aged eighty-one and upwards, was not perhaps of a very positive kind in any direction. He proved that Clark spoke of the child as his daughter, was proud and devotedly fond of her, and so spoke of her as to leave no other impression than that she was to be the recipient of all his property. He had never heard Clark " speak of Zulime as his wife, nor as holding a very different relation to him;" never having conversed with him on this subject. Clark had never made use of any expression to him which would convey the idea that Myra was an illegitimate child. He had no particular knowledge of Mr. Clark's ever having married. He never told Davis that he was married. The matter was never a subject of conversation between them. He did not think Mr. Clark would have been likely to marry two wives. He had never had any conversation with the sisters of Zulime (Mesdames Despau or Caillavet) in connection with Myra's legitimacy. They had never urged him to claim the estate for her. He added—

"Could I have had the satisfactory means of proving that Myra was Mr. Clark's legitimate child, and could I have had reason to believe that anything would have been gained from

out the estate, I certainly should have taken legal advice, and should have followed it. It was reported that Clark's estate was insolvent, and before I had any means of ascertaining the precise situation of the estate, Myra was married. I never doubted but that some arrangement had been made by Mr. Clark in relation to her."

In regard to this testimony of Colonel Davis, Peter A. Browne, a member of the Philadelphia bar—and on terms of intimacy with Davis, and an administrator *pendente lite* of his estate—testified:

"Colonel Davis frequently told me that she was the natural daughter of Clark, and his (Colonel Davis's) adopted child only. I cannot point out any time in particular in which this was said, because it happened in the course of conversation at intervals extending over the whole time of our acquaintance. On one occasion Colonel Davis told me that his deposition had been taken in one of the suits heretofore brought by the plaintiff, upon which I said that I supposed that he had declared that Daniel Clark had not been married to the plaintiff's mother. To which he answered that that question had not been put to him in such a direct manner as to elicit an answer; but added that Clark was no more married to her than he (Davis) was."

IV. So far as respected the great point of the marriage. On the other matters set up, the reporter must be brief.

The defendant's title, as shown from Relf & Chew, and relied on, was through sales made more than a year after Clark's death—some in 1820 and thereabouts. They were not apparently made in virtue of any order of court, directing them.

As respected Clark's insolvency at the time of his death, it was plain enough that in 1811, 1812, and even in 1813, and almost or quite up to the time of his death, he had no ready money, and was greatly straitened for the want of it: not being able to supply even his mother's small requirements. He was very gloomy and despondent as to the issue of commercial things, including his own; all then greatly embarrassed and depressed by our war of that day with Great

Britain.  But not long before Colonel Davis's departure from New Orleans, Clark had exhibited to him a schedule of his affairs, showing a surplus of $500,000.

The other defences set up were chiefly matters of law, and need not, perhaps, be presented more fully than they are given at p. 644–5.

Such in a general way was the case as the reporter conceives it.  And yet a good deal more, some may think, is required to give it its proper aspect.  It must suffice to say that there was hardly a witness who was not directly or indirectly attacked.  Forgeries and thefts were charged or insinuated in regard to document after document.  The chastity of Madame Despau, who was divorced, and of Madame Caillavet in early life, as of Zulime herself, were assailed.  Mrs. Harper's veracity was put to similar proof.  A son of Colonel Davis (who, however, had had a newspaper quarrel with Mrs. Gaines), was a witness to disprove his father's statement as to what was directed to be put in the petition of 1805 for alimony, and to prove that in his father's family she was regarded as the natural child of Clark; while Mr. Coxe, examined on his *voir dire*, to show that he had settled a large claim against Clark's estate with Relf & Chew, the executors of the will of 1811, was argued not to be relieved of bias by the fact that he stated that he considered he had no interest, whatever, in the result; it being indifferent to him who succeeded to Daniel Clark's estate, the estate itself being liable to him into whosesoever hands it passed. But these parts of the controversy the reporter does not deem it necessary to present.

The controversy had been already, in various forms, six different times before this court.*  *Messrs. Jones, Key, Reverdy Johnson, Campbell, Lawrence, Cushing,* and *Perin,* representing, at different times, the complainant, and *Messrs. R. S.*

---

* In Ex parte Myra Clark Whitney, 13 Peters, 404; Gaines *v.* Relf, 15 Id. 9; Gaines *v.* Chew, 2 Howard, 619; Paterson *v.* Gaines, 6 Id. 550; Gaines *v.* Relf, 12 Id. 472; Gaines *v.* Hennen, 24 Id. 558.

*Coxe, Janin, Henderson, Barton, Brent, May, Webster, Duncan,* and *Hennen,* the adverse claimants.

Some mention must be made of three of these cases, in which three the question of merits was involved. These were thus:

In 1836, Mrs. Gaines filed a bill against one Paterson and numerous other persons, purchasers of estates of which Clark died in possession, and also against Relf & Chew, executors of the will of 1811,—she, Mrs. Gaines, claiming these estates as heir and devisee of Clark. In their defences to this bill, different respondents pursued different courses—some one, some another. Relf & Chew, for example, demurred. Paterson, however, answered, and his case came up by itself, A.D. 1848, in *Paterson* v. *Gaines.** The court, on the case as then presented, unanimously considered (Taney, C. J., and Catron and McLean, JJ., being absent, but Wayne, McKinley, Daniel, Nelson, Woodbury, and Grier, JJ., sitting), that the evidence of Madame Benguerel sufficiently established the bigamy of Des Granges, and that of Madame Despau the marriage with Clark; and it adjudged "upon the evidence in this cause," that this marriage was lawful, and that Mrs. Gaines was Clark's only legitimate child and heir at law, and entitled to *her legitimate portion* of four-fifths of Clark's estate. The will of 1813 had not yet been established.

The subject next came up against other defendants at December Term, 1851, in *Gaines* v. *Relf et al.,*† on a record with much additional evidence; more like the present case. The complainants there having set up the decree just mentioned (*Gaines* v. *Paterson*) as *res adjudicata,* the defendants asserted that the case was "no honest exposition of merits, but was brought about, allowed and consented to, for the purpose of pleading the same as *res adjudicata* upon points in litigation not honestly contended." The court (Catron, McKinley, Nelson, Grier, and Curtis, JJ., agreeing; Taney, C. J., and McLean, J., being absent, and Wayne and Daniel, JJ., dissent-

---

* 6 Howard, 550.        † 12 Il. 473.

ing), deciding that there was " no earnest controversy," held, among other things,—

1. That Mesdames Despau and Caillavet were not worthy of credit, and were contradicted both by Coxe and by the alimony record of 1805.

2. That the naked confession of Des Granges that he had been guilty of bigamy made to Madame Benguerel and her husband, was incompetent evidence, even admitting it was made.

3. That the record of the suit of 1806, wanting as it did the "petition," proved nothing, and was incompetent.

4. That the ecclesiastical record of 1802 of Des Granges' prosecution for bigamy overthrew the feeble and discredited evidence introduced to prove it.

Mr. Justice Catron, who gave the opinion, said, among other things, as in the extracts from it which follow : ·

"The complainant's principal witnesses are Madame Despau and Madame Caillavet. It appears that, in the spring of 1801, Des Granges went to France. He was absent from his wife Zulime about fifteen months.

"Coxe proves that Madame Des Granges brought him a letter of introduction from Clark, stating that she was then far gone in pregnancy, and requesting Coxe's attention to her wants; that he furnished a house and money, and employed a nurse; that Clark's letter stated the child was his; and we must assume that the mother by delivering the letter impliedly admitted the fact. She was delivered; Coxe had the child put out to nurse. All this time, Madame Despau was with Madame Des Granges. The child was Caroline, and who these witnesses swear without hesitation was the child of Des Granges; and who, Madame Despau swears, was born in 1801. Nor does either witness intimate that she was born in Philadelphia.

"It is true beyond question that these witnesses did know that their sister Des Granges went North to hide her adultery; that she did delude her absent husband; that she did impose on him the mendacious tale, that her sole business North was to clear up doubts that disturbed her mind about his having another wife. These facts they carefully conceal in their depo-

sitions; and on the contrary swear that she went North to get evidence of her husband's bigamy and imposition on her.

"When they swore positively that Caroline was the child of Des Granges, they did know that he had been in France, and his wife in New Orleans, and they had not seen each other for more than a year before the child was born; and Madame Despau could not be ignorant that Clark claimed it as his, and that the mother admitted the fact to Coxe.

"Des Granges went to France with a full power to transact business for his wife and her three sisters, in which the latter style him their brother-in-law. This was his sole business in France, so far as this record shows; and when there, he wrote to Clark, in July, 1801, to assist his, Des Granges' wife; expressing his sympathies, forwarding a package for her, and regretting that he had not heard from her. He also expressed the sincerest gratitude for Clark's proffered kindness in providing for and aiding Zulime in his absence. From these facts it is clear, as we think, that at the time Des Granges left for Europe, he and his wife were on terms of intercourse and ordinary affection, and certainly not separated; and that the cause of their separation is found in the connection formed by Clark and Zulime in Des Granges' absence.

"It is palpable that the witnesses, Despau and Caillavet, swear to a plausible tale of fiction, leaving out the circumstances of gross reality. These originated, beyond question, in profligacy of a highly dangerous and criminal character; that of a wife having committed adultery, and been delivered of an illegitimate child, in the absence of her husband; not only on his lawful business, but on hers, and at her instance.

"This child, with the knowledge of both of these witnesses, and certainly with the aid of one of them, if not both, was concealed in a foreign country, where the mother went and was delivered. This is the reality these witnesses conceal; roundly swearing that they knew this child to be Des Granges'.

"They also swear that Clark arranged with Zulime's family before he went to Philadelphia, and had the assent of her family to marry her; they having previously discovered Des Granges' bigamy. But, according to their account, so scrupulous and delicate was this injured woman, that she refused to marry Clark until she went to New York and there ascertained for herself the fact, that Des Granges had another wife; that Clark soon fol-

lowed Madame Des Granges and Madame Despau, as previously agreed on; and even then Madame Despau swears, when Gardette had informed them that he was present, and witnessed Des Granges' first marriage, her sister's sense of propriety and delicacy was so great, that earnest persuasions had to be used by Clark to overcome her scruples. We cannot shut our eyes on the truth, and accord our belief to this fiction.

"Madame Despau is further discredited by Coxe's evidence. Their contradictory statements raise a question of integrity between the witnesses. If they were equally entitled to credit, still Coxe's statement has several advantages. First: Madame Des Granges disavowed in the strongest terms that she was the wife of Clark by marrying Gardette. Secondly: So important a communication as Madame Despau declares her sister made to Mr. Coxe; so ruinous to Clark's matrimonial prospects, and so deeply disgraceful to him, must have been remembered by Coxe, if such communication had been made.

"Again. Madame Despau swears that she and her sister Des Granges went to Philadelphia to obtain evidence of Clark's marriage with Zulime; that they could find no record of the marriage, and were told the priest who performed the ceremony had gone to Ireland. What occasion could there be for further proof? Madame Despau swears that Clark had proposed, and family arrangements had been made with him at New Orleans, to marry Zulime; that these proposals were made with the full knowledge of all Zulime's family; that Clark followed the witness and Zulime North to fulfil the engagement; that he met them, and the marriage took place; that she, Madame Despau, was present; that Mr. Dosier, a wealthy planter of New Orleans, and an Irish gentleman of New York, were also present. Zulime's family consisted of three sisters and their husbands. Madame Caillavet swears that Clark conversed with her as his sister-in-law, and admitted the marriage openly to her. Than this, no further proof of it could be required, if true.

"In 1805, she again alleged in a legal proceeding, deeply affecting her and Des Granges, that she was his lawful wife, and that he was her husband. The court sanctioned her statement by founding its judgment on it; and as a wife, she recovered the amount claimed as alimony. With the full knowledge this woman had of all the circumstances connected with the charge of bigamy against Des Granges, our judgment is convinced that

she stated what was true, and that she was Des Granges' lawful wife at the time it is alleged she married Clark.

"The complicated and curious circumstances that surrounded this charge of bigamy against Des Granges in the Paterson case, and which were then so difficult to deal with, are easily enough understood now. The mystery is explained by the fact now presented, that in Des Granges' absence to France, his wife formed a connection with Clark, and the child Caroline came of that illicit connection. On Des Granges' return home, Madame Caillavet notified her sisters to return in haste, as Des Granges' first wife was at New Orleans. Mesdames Despau and Des Granges forthwith returned, and at this time it was that Des Granges was so fiercely assailed by public opinion, and very soon after arrested on general rumor and tried for bigamy. The reports, to which these witnesses swear, obviously originated with, and were relied on by Madame Des Granges, her sisters and friends, to harass and drive Des Granges from the country, so that his wife might indulge herself in the society of Clark, unincumbered and unannoyed by the presence of an humble and deserted husband. And this was in fact accomplished, for Des Granges did leave the country soon after he was tried for bigamy, and Clark did set up Des Granges' wife in a handsome establishment, where their intercourse was unrestrained.

"In 1805, when Des Granges again came to New Orleans, his wife immediately sued him for alimony, as above stated; speedily got judgment against him for five hundred dollars per annum· on the same day, issued execution, and again drove him away.

"As to the testimony of Madame Benguerel. We deem it extremely improbable, that a man should openly confess to the friends of Zulime, who reproached him with having committed a foul and high crime, that he was guilty; and this, too, on the eve of his apprehension and examination, on which he was compelled to give evidence against himself, when he swore that there was no truth whatever in the charge, and in which he was supported by this supposed first wife, who was then examined, and also by Zulime herself.

"On the admissibility of Des Granges' confession, that he committed bigamy when he married Zulime, the question arises

whether this confession (if made) could be given in evidence against the defendants?

"The respondents introduced the copy of a mutilated record, now relied on, for the complainant, to prove the bigamy of Des Granges. It purports to be a suit of Zulime Carriere against Jerome Des Granges, commenced in 1806, in the former County Court of New Orleans.

"To give the record this effect, it must appear that the plain-tiff did set out in her petition the fact that said marriage was null *by reason of the bigamy of Des Granges,* and that she prayed to have its nullity adjudged by a judicial decree, and that such decree was made *on the issue.* Nothing of the kind appears here. We have no evidence what the cause of action was, nor can any inference be drawn from the memoranda made by the clerk that the suit was to establish the *bigamy.* All that appears from these memoranda is, that debt or damages to the amount of $100 was claimed by the plaintiff, and that $100 in damages was recovered. Nor does the demurrer contradict this assumption. This mutilated record, therefore, proves nothing in this cause."

Judgment was accordingly given against Mrs. Gaines; but from it, as already said, Wayne and Daniel, JJ., dissented.

At December Term, 1860, the matter again came up in *Gaines* v. *Hennen.** The evidence was much the same as in the former case, except that owing to the establishment in the meantime by the Supreme Court of Louisiana, of Clark's will of 1813, Mrs. Gaines now came into this court, declared by her father to be his legitimate daughter and universal legatee. This fact the court treated as a feature in the case greatly distinguishing it from all preceding ones; and as being itself a potential evidence of a marriage. At the same time they spoke with respect of the testimony of Mesdames Despau and Benguerel, while that of Mr. Coxe they considered, exhibited so considerable a bias against the marriage, that it was to be taken with considerable allowance. The

* 24 Howard, 553.

court thought the evidence of bigamy sufficient for a civil case, and treated the ecclesiastical record of 1802 as one of a court having no jurisdiction.   They regarded the record of 1806, though the petition of it was 'lost, as a record declaring void for bigamy the marriage of Des Granges and Zulime.   Independently of this, the law of Louisiana was declared to be that in cases of bigamy where either parent contracts the second marriage in good faith (a matter always presumable), the issue is legitimate.   And the title of Mrs. Gaines not being held to be barred by prescription, the court declared that after a litigation of thirty years the principles applicable to that lady's rights in her father's estate, were " now finally settled."   From this judgment, concurred in by McLean, Wayne, Nelson, Campbell, and Clifford, JJ., a dissent was recorded by the Chief Justice (Taney), and Catron and Grier, JJ.

Such was the state of things as the reporter understood them when the present case came here.   This case was now placed partially on the ground that in *Gaines* v. *Hennen* an erroneous conception of fact was had by the court, owing to the immense size of the record; partially on the ground that *Gaines* v. *Hennen* was in reality not " an earnest controversy," any more than *Paterson* v. *Gaines* had been; partially on the insolvency of Clark's estate and the partnership articles giving two-thirds of the premises sought to be recovered to Chew & Relf; these last two being features, as it was said, peculiar to the present cases.

*Messrs. McConnell and Taylor, for the appellants, relied largely on* Gaines *v.* Relf; *Messrs. Cushing and H. D. Stone (with a brief of Mr. Stone), contra, on* Gaines *v.* Hennen, *and* Paterson *v.* Gaines.

Mr. Justice DAVIS delivered the opinion of the court.

It was supposed, after the decision in *Gaines* v. *Hennen*,[*] that the litigation, pursued in one form and another for over thirty years, by the complainant, to vindicate her rights in

---

[*] 24 Howard, 553.

the estate of her father, was ended. But this reasonable expectation has not been realized; for other cases, involving the same issues and pleadings, and supported by the same evidence, are before us; and we are asked to review the principles of law and questions of fact, on which the Hennen decision was pronounced, and thus reopen the whole contro-versy. The legal principles, on which that case was decided, aré no longer open for consideration. They were fully and finally settled, and are controlling in all future disputes re-lating to the same subject. But these defendants insist they have a right to be heard on the issues of fact presented in this case, even, if they are the same as those decided in the Hennen case.

It can serve no useful purpose to discuss the point how far the decision in *Gaines* v. *Hennen* is *res judicata*, as to the city of New Orleans and others in like position; for we shall examine this case, as if the questions of fact, decided in the former case, were still open questions to these defendants and others, whose cases are now before the court. Never-theless, it is proper to say, when this court, in a real contest, has decided questions of fact on the most careful investiga-tion, and after full argument by able counsel, it will be presumed a correct conclusion was reached, and before a decision thus rendered will be reversed, it must very clearly appear that error was committed.

The legitimacy of Mrs. Gaines is the turning-point of this controversy; for, since the probate of the will of 1813, if legitimate, she cannot be deprived of the estate of her father by any of the defences interposed in this suit. These de-fendants claim, as a question of proof, from the record, that she is an illegitimate child—adulterous bastard of Daniel Clark—and cannot take the estate of her father, either as heir or legatee, under the will of 1813. This court decided, in the Hennen case, that by the law of Louisiana she was entitled to a legal filiation as the child of Daniel Clark and Marie Julie (Zulime) Carriere, begotten in lawful wedlock. Was that a mistaken judgment?

To this question we will first direct our attention, con-

sidering, afterwards, the objections made to a recovery by her, even if her legal filiation is established. We shall not attempt to give the history of the litigation, which, it is to be hoped, will be closed by this decision; for the profession is familiar with it by the repeated adjudications of this court. It is enough to say it has been pursued by the complainant through a third of a century, with a vigor and energy hardly ever surpassed, in defiance of obstacles which would have deterred persons of ordinary mind and character, and has enlisted, on both sides, at different periods, the ablest talent of the American bar.

This case seems to have been defended on the idea, that every presumption was against the legitimacy of Mrs. Gaines, and the inclination of courts would be so to decide. But, as she was declared legitimate by her father in his last will and testament, common justice, not to speak of legal rules, would require that such a declaration should only be overborne by the strongest proof; and yet detached portions of evidence, scattered through the record here and there, are invoked to destroy the dying declarations of an intelligent man, that a beloved child was capable of inheriting his property.

The influence of the probate of the will of 1813, in deciding the civil status of Mrs. Gaines, cannot be over-estimated. Without the evidence which it furnishes, her legitimacy might be questioned; but with it, in connection with the other evidence in the record, it is hard to see how it can longer be doubted. The circumstances under which this will was recognized are peculiar, and entitle the court which pronounced it valid to the tribute of our admiration. It was proved by the memory of witnesses, forty-three years after it was made, in the height of the litigation instituted by Mrs. Gaines to obtain possession of her father's estate; but, notwithstanding the effect of the probate of it was to recall the will of 1811, and endanger titles acquired under it, so strong was the proof of its authenticity, and so complete the evidence of its contents, that a court, administering justice in the midst of a people claiming rights hostile to it, did not

hesitate to order it to be recorded and executed as the last will and testament of Daniel Clark.

This will, thus allowed to go to probate, contains the following clause: "I do hereby acknowledge that my beloved Myra, who is now living in the family of Samuel B. Davis, is my legitimate and only daughter; and that I leave and bequeath unto her, the said Myra, all the estate, whether real or personal, of which I may die possessed, subject only to the payment of certain legacies hereinafter named." The will was made only a short time before the testator died, and is to be taken as his dying testimony that he believed the declarations in it to be true. And no one can read the evidence on which it was established, especially the evidence of Harriet Harper, Boisfontaine, and Bellechasse, without being convinced of the unbounded affection of Daniel Clark for his child, his sensibility as to her being declared legitimate, his pride in the position she would occupy as heir to his large estate, and his belief that he had secured the estate to her. Nearly his last words were about this child, and the necessity of taking care of the will on her account.

The inquiry naturally arises, what motive had he to declare his child legitimate if he knew the fact were otherwise? He was a man of superior intelligence, and long residence in Louisiana, and necessarily knew by the laws of the State he could secure to his child enough of his large property to make her rich, if she were illegitimate. Is it conceivable that such a man would risk a declaration of legitimacy, which he knew to be false, and thus jeopard the estate, which he insisted with so much confidence he had secured to his child, and in the security of which he said "he would die contented?"

It is argued that the conduct and letters of Clark, for years before this, are inconsistent with the idea of Myra's legitimacy. Conceding this is so, and yet it in nowise disproves the good faith and sincerity of Clark when he made his will. The conduct of Clark is susceptible of easy explanation. He had contracted an unfortunate marriage, and, in many

respects, a disreputable one, having married a person with whom he had previously lived improperly, who, without a divorce, had married again. Possessed of commanding influence and high position, and mingling in social intercourse with the best society of the country, it was natural, while in strong health and the full tide of prosperity, he should be desirous of concealing such a marriage; but when sickness overtook him, and he necessarily reviewed his past life, it was just as natural he should wish to repair the consequences of his folly (to use no harsher term) by a deliberate acknowledgment that the child born of that marriage was legitimate, and could, therefore, inherit his estate. He was intelligent enough to know that, if he died without giving his child the status to which she was entitled, she would in all probability pass through life with a stain upon her birth, and be unable to enjoy his property, for he had taken uncommon pains to conceal his marriage.

The difficulty of acknowledging the marriage to Zulime was greatly increased by her subsequent marriage to Gardette. Clark could not acknowledge it to the world without injuring her, which no right-minded man under the circumstances would wish to do. According to the testimony of Baron Boisfontaine, Clark considered her blameless, and would have made his marriage with her public if it had not been for the obstacle interposed by the Gardette marriage. It is easy to see the struggle in the mind of Clark on this subject. He had sustained improper relations with a woman of uncommon personal attractions, to whom he was passionately attached. This woman he afterwards married, and lived with in secret for several years. Estrangement took place, and he separated from her. She had repaired to Philadelphia to procure evidence of her marriage; but being unable to get it, and advised of its invalidity, had married another man with whom she was quietly living. Two children were the result of the intercourse between them—one born before and the other after marriage—the latter the legitimate heir of the father, if he married the mother, believing in good faith she was capable of contracting mar-

riage. To acknowledge a marriage with such surroundings was to lose social caste, and put in peril a woman whom he once loved and still professed to respect. Not to acknowledge it was to bastardize a child for whom he had great affection, and to see a large part of his estate go to others, who had no claims on his bounty. There were thus presented to his mind conflicting motives. Duty to himself and society, and affection for his child, prompted him to proclaim his marriage, while pride, the fear of social degradation, and the natural desire not to inflict additional injury upon Zulime, impelled him to a contrary course. That he yielded to the influence of unworthy motives, and lived for years a life of deception, only proves that his baser nature during that time got the control, and that he acted as other men in similar circumstances have acted before him. But, before he died, the better nature of this man of lofty pride and sensitive honor was aroused and gained the ascendency. He atoned in some measure for the errors of his past life; for he not only made a public acknowledgment, in the last solemn act of his life, that his child was legitimate, but a short time previous to his death frequently repeated the declaration to Mrs. Harper, who had nursed the child in infancy, and to Boisfontaine, who managed his plantations, and was with him when he died.

Testimony like this outweighs the evidence furnished by the conduct of Clark, when, governed by bad influences, he was even willing to leave a stain of dishonor on the birth of his child, rather than make known a marriage which would tend to degrade him in the estimation of his friends and the public. If the evidence of Mrs. Harper and Boisfontaine is true (and who can doubt it since the action of the Supreme Court of Louisiana?), it confirms the declarations of the will, and shows a willingness, nay, more, an anxiety on the part of Clark to talk about a subject the nearest his heart, and one which of necessity must have awakened his conscience. To whom would he be so likely to communicate the information that Myra was born in lawful wedlock as to the woman who nursed her and the man

who remained with him, at his request, during his sickness, and until he died?.

But the will itself, in another clause, furnishes corroborating evidence of Mrs. Gaines's legitimacy. A legacy of five thousand dollars is left to Caroline Des Granges, with a suitable annuity until her majority. The person thus designated was the natural child of Clark by Zulime, and yet he avoids calling her his child, gives her the name of the ostensible husband of her mother at the time of her birth, and recognizes Myra as his legitimate and *only* daughter. Many reasons may have influenced Clark to pursue this course. Delicacy to the mother may have induced him to reveal no more than was necessary to accomplish his purpose; or an unwillingness, by his will, to affix a brand of reproach on this child, who was lawfully entitled to bear the name of Des Granges, may have been the motive; or a wish that Myra, the object of his greater affections and superior bounty, might never know the wickedness of his life, may have prompted his course. It is not necessary to inquire whether these considerations, singly or together, constituted the reasons for the peculiar wording of the legacy. It is enough to know from the legacy that Clark had both children in his mind when he drew his will. If so, and he knew both were illegitimate, why discriminate so largely in favor of one and against the other? No answer can be given to this question on the assumption he knew the birth of both to be dishonorable; but it is easily answered, if one was legitimate and the other not, for it is the experience of the world (and it is well it is so) that every person owning property desires his legitimate children to have the greater share of it.

The attempt to impeach the validity of this will shows the importance attached to it by the defence in determining the issue we are now considering. But the will cannot be attacked here. When a will is duly probated by a State court of competent jurisdiction, that probate is conclusive of the validity and contents of the will in this court.

But why, if the will is invalid, has the probate of it rested . for twelve years unrecalled, when express liberty was given

by the Supreme Court of Louisiana for any one interested to contest it in a direct action with complainant? If, with this clear indication of the proper course to be pursued, the probate of the will still remains unrevoked, the reasonable conclusion is, the will itself could not be successfully attacked. Be this as it may, while unrevoked it is the law of this case, and so this court held in *Gaines* v. *Hennen.*

But it is said the probate of the will in dispute cannot stand, because there was no direct action by the Louisiana court annulling the probate of the will of 1811. This was not necessary. The probate of the will of 1813, by the mere fact of its probate, necessarily annulled the will of 1811, so far as its provisions were inconsistent, and so far as the estate was not legally administered under it. And this precise point was decided in the Hennen case.

We will proceed now to consider the question of actual marriage, and whether Clark, in good faith, contracted it. Madame Sophie Despau swears to the solemnization of a marriage between Clark and Zulime, by a Catholic priest, in Philadelphia, in 1802 or 1803. If this witness is to be believed there is an end of the case, for no amount of negative testimony that Clark could not have made the marriage will weigh down the testimony of an unimpeached witness, who was present and witnessed the ceremony. But why does she not tell the truth? Is it because she was the sister of Zulime? Who so likely to be present at a private marriage, designed to be concealed from the world, as a near relative of one of the parties? Clark knew he was contracting a marriage which would lessen his standing in society, and might not want any very dear friend or relative present. Not so with Zulime. She was marrying a man of rank and position, with whom she had lived in unlawful intimacy, and what so natural that she should take with her to Philadelphia, as a witness of her happiness, the same sister who had witnessed her previous disgrace when Caroline was born. Is she not to be believed because she speaks of Caroline as one of the children born of the marriage of her sister with Des Granges, when she must have known she was the child

of Clark? It is doubtless true she knew Clark to be the real father of the child; but she certainly did not falsify in stating Caroline was born of the Des Granges marriage. This was true, and yet Clark had seduced the wife and was the father of the child. But is she to be condemned and her evidence discarded because she does not disclose the frailties of her sister, and instead of answering plainly that Caroline was the child of Clark, speaks of her as born of the marriage with Des Granges? Des Granges was, in the eye of the law, the father, though Clark was, in .fact, the father; and although Madame Despau knew the real parentage of Caroline, we cannot say she did not believe she was answering properly the cross-interrogatories propounded to her. At any rate, we cannot say her testimony in this regard casts suspicion on the evidence given to establish the marriage. We concede something to the infirmity of human nature. This aged witness, testifying forty-six years after events which must have indelibly fixed themselves on her memory, and when concealment of anything, no matter how unpleasant, would do harm rather than good, still shows pride of family, and studiously avoids the condemnation of her unfortunate sister, for she can speak of her sufferings, but not of her frailties. All this may prove weakness of character, but does not tend to prove she told a falsehood when she testified to the marriage of Clark and Zulime. But she is corroborated by Madame Rose Caillavet, an elder sister, who was eighty-three years of age in March, 1849, when her deposition in this cause was taken. *She* testifies the marriage was arranged in New Orleans; that Zulime wrote to her from Philadelphia that it had taken place; that Clark afterwards acknowledged it, and frequently stated that Myra was his lawful and only child. There is nothing in this record worthy of notice to impeach this testimony. It was given by one whose life was nearly ended, and who could have no motive, as far as we can see, to tell an untruth. Like Sophie Despau, she was the sister of Zulime, and equally anxious to vindicate her good name, but this furnishes no good reason to discredit her.

In support, then, of the issue that there was a marriage between the father and mother of complainant, we have the testamentary disposition of the father; his declarations at the time of his death, and shortly before it, to Mrs. Harper and Boisfontaine, that Myra was legitimate; similar declarations at other times to Madame Caillavet, with an acknowledgment to her of the marriage; and, superadded to all this, the evidence of Madame Despau that the marriage ceremony took place in her presence; with the admission of Clark to Boisfontaine that he would have made it public but for the subsequent conduct of Zulime in marrying Gardette.

To disprove the fact of marriage, the evidence is of a negative character and wholly inferential. Concede it is true that Clark behaved so as to cause his most intimate friends to disbelieve the fact of marriage; that he held himself out to the world as a single man, and by public repute, after the time of the alleged marriage, lived with Zulime, ostensiby not as his wife, still the case of the complainant is not weakened. It was the fixed purpose of Clark to conceal this marriage, as is clearly shown by the evidence; and a man of his mental resources would be likely to use every means calculated to accomplish his purpose; and these things, instead of proving the marriage did not occur, only prove how effectually it was concealed.

But it is argued with earnestness and ability there was no marriage, because those who knew Clark intimately swear to their belief that one of his proud nature would never marry a person with whom he had previously lived unlawfully. Opinions of witnesses on such a point can have no weight in determining the issue we are trying. Men of equal position and equal pride with Clark have married those with whom they were living unlawfully, and why should not Clark do the same thing? No good reason can be given why he should not act in a matter of this kind as other men, just as sensitive and proud, have acted before him. If he seduced Zulime and could lawfully marry her, it was his duty to do it; and can we say he was too proud to marry her, and thereby repair the wrongs she suffered at his hands? To

say so wou d be to reflect upon his memory more than is necessary.

In denial of the marriage it is said, if Clark had not been free to do so, he would never have written a letter, stating if he could secure the affections of Miss Caton he would offer himself to her.  This letter was written after his estrangement from Zulime and separation from her, but before her intermarriage with Gardette.  It cannot be denied the writing of it was a base and inexcusable act, and in itself affords an additional proof, if any were necessary, how easy the descent, when a man, with a fixed purpose, is leading a life of deceit.  Clark, for years, had been imposing himself on the world in a character different from his real one, and when his affections were weaned from Zulime he attempted to do what, if he had succeeded in doing, would have blackened his memory forever.  'But fortunately, before he died, his line of conduct was changed.  Affection for his child and uncertain health, doubtless subdued him, and induced him to disclose what, as an honorable and honest man, he should never have wished to conceal.  In resolving the issue of marriage or no marriage, the effect of this letter is unimportant when opposed to the direct testimony that there was a marriage, on which we have offered sufficient comments. Without pursuing the subject further, it is our conclusion from the whole record, as a matter of fact, that the father and mother of complainant were married.

Did Clark contract that marriage in good faith?  If this inquiry can be answered in the affirmative, the legitimacy of Mrs. Gaines is no longer an open question.  The fact of marriage being proved, the presumptions of law are all in favor of good faith.  To disprove the good faith in this case " there should be full proof to the contrary, and the law will not be satisfied with *semi-plena probatio.*"* Chief Justice Martin, in *Clendenning* v. *Clendenning,*† in discussing the question of the extent of the proof required to overturn the presumption of good faith, says, " the proof must be irre-

---

* Gaines v. Hennen, 24 Howard, 591. ·        † 3 Martin, N. S., 442.

fragable." Testing this case by these rules, the question is of easy solution. Zulime, when quite young, was married in New Orleans to Jerome Des Granges, from whom she was not divorced at the time of her marriage with Clark. It is in evidence that Clark was a single man; and the inquiry therefore is, did he believe Zulime had the capacity of contracting marriage with him? If in good faith he believed she was free to marry him on account of the invalidity of her marriage with Des Granges, and with a *bona-fide* belief of this did marry her, then, by the laws of Louisiana, such a marriage has its civil effects, and the child born of it is legitimate, and can inherit her father's estate.

We do not propose to discuss the question, whether Des Granges was or was not guilty of bigamy in marrying Zulime? That he was accused of it is very clear, and that there is evidence, in the record tending to show it was true, is equally clear; but where the weight of the testimony leaves the point in dispute, the purposes of this suit do not require us to decide.

Clark had been criminally intimate with Zulime before his marriage, and on one occasion sent her, secretly, to Philadelphia, where she gave birth to a child, of which he acknowledged himself to Daniel W. Coxe as the father. Whether these improper relations were continued after the return of Zulime to New Orleans we are not informed by the record; but, in the absence of proof to the contrary, the fair presumption would be they were. It is asked why Clark should marry her if he could live with her without it? The natural answer would be, he loved her, and wished to terminate the existing disreputable connection; for we have no right, unless there is clear proof it is so, to ascribe a bad motive for a good act. It may be Zulime was unwilling longer to continue the connection, and Clark, rather than part with her, married her. But whatever were the controlling motives with the parties, there was nothing to induce Clark to enter into a marriage contract, unless he thought he had a right to do it. He was a man of high intelligence, and knew what every man of ordinary intelligence knows,

that he subjected himself to a criminal prosecution and absolute disgrace, if he married a woman who was lawfully the wife of another. Is it to be supposed for a moment—considering the political and social position he occupied, on which so much stress is laid by the defence—that he would expose himself knowingly to the penalties provided everywhere against the crime of bigamy? Clearly not.

From the very nature of the case, Clark must have believed he had a right to marry Zulime. But we are not without testimony to prove his good faith. Madame Despau swears it became known in New Orleans that Des Granges had another wife, who was living when he married Zulime, and upon this she separated from him and returned to her family. It was then arranged that Clark should marry her; but before doing so, it was thought best to procure record evidence of the first marriage of Des Granges, which was said to have taken place in New York. For this purpose she went to New York in company with Zulime, but found the registry of marriages of which she was in search was destroyed. Failing in their object they repaired to Philadelphia, where it was appointed Clark should meet them, and while there Gardette told them he was a witness to the marriage of Des Granges in New York, and the wife was then living in France. Upon this communication Clark said to Zulime, "You have no longer any reason to refuse to marry me;" to which she assented, and the marriage was solemnized. If this testimony is true, and we have said in a previous part of this opinion there is nothing to discredit this witness, then the good faith of Clark in contracting marriage with Zulime is established. And who can doubt Zulime was in equal good faith? But the determination of that point is not essential in settling the rights of the complainant in this suit. No better evidence could be furnished Clark of the invalidity of Zulime's prior marriage, and her right to marry again—short of a pronounced divorce by a decree of court—than the testimony of a witness who was present at the marriage in New York, and who knew the woman to whom Des Granges was there united was living in France. The regis-

try of marriages, if in existence, would only have proved Des Granges had been married before he married Zulime, but would have failed to prove whether the wife of the first marriage was living or dead.

But Madame Despau also testifies that Des Granges admitted his crime, and it is fair to presume, although her testimony is silent on the point, she communicated this admission to Clark. The fact that Des Granges was charged with bigamy was known to Clark, and it is reasonable to suppose, while in New Orleans, he had informed himself of the evidence to sustain it; and if he had an interview with Madame Benguerel he must have been convinced of it, for she testifies she and her husband were intimate with Des Granges, who, when charged with his baseness, admitted it, but excused his conduct on the ground that he had abandoned his first wife, and never intended to see her again. But whether Clark saw Madame Benguerel or not, he could not have failed, before he left New Orleans, to collect all the evidence in his power on this subject, and his mind was, therefore, well prepared to receive the evidence of the bigamy of Des Granges, and of Zulime's right to marry him, which Gardette furnished.

The testimony of Madame Despau is fortified, in many important particulars, by that of Madame Caillavet. If, however, the evidence we have been considering falls short of proving the good faith of Clark in contracting marriage with Zulime, the testamentary recognition by him that the issue of the marriage was legitimate relieves the question of all doubt. The child could not be legitimate unless the father married the mother in the full belief he had a lawful right to do so, and this a man of the intelligence of Clark could not help knowing. The disposition of property to take effect after death is one of the most solemn acts in the life of a man, and in itself is the highest evidence of good faith. The influence of the will of 1813 in settling the question of good faith is so far conclusive, that to overturn it there must be full proof to the contrary. There is no such proof in the record. What there is relates to the in-

consistencies in the conduct of Clark on which we have commented, and which it is unnecessary here to repeat. We find, therefore, as a further fact in this case, that Daniel Clark contracted marriage with Zulime Carriere in good faith.   As Clark was in good faith when he married the mother of the complainant, it follows that she can take the estate under the olographic will of 1813.

It is conceded the property in dispute, and which the defendants admit they were in possession of, is a part of the estate of Daniel Clark left at his decease, and devised to complainant in his last will.   She is, therefore, entitled to the relief sought by her bill, unless prevented by some of the special defences interposed, which we will now proceed to notice.

It is claimed as a question of law, that the decree of this court in *Gaines* v. *Relf,** is *res judicata* both as to the present claim for the property and the civil status of the complainant; but this precise point was met and disposed of adversely in the Hennen case, and will not be further considered.

Two defences have been prominent throughout this litigation, and as they are both applicable to some of the cases now before the court, and as one opinion will in fact dispose of all the cases, we will consider in this case all substantial defences to the recovery by Mrs. Gaines of her father's estate.

In bar of the claim of the complainant, titles acquired under Relf and Chew, as executors of the will of 1811, are set up.   But these titles cannot avail the defendants, because Relf and Chew, as executors of the will of 1811, had no authority to make the sales, and could, therefore, pass no interest to the purchasers.   There is no question in this record of the effect of the probate of the will of 1811, while unrevoked, upon property legally sold by the executors; because the very foundation of the bill in this case is, that there was no legal sale of the property.   In Louisiana, by

---

* 12 Howard, 472.

the law in force when these sales were made, the power of executors to make sales without the order of court terminated at the end of a year from their appointment. This is not only clear from the law itself, but also from the judicial decisions of the State. Chief Justice Martin, in *Donaldson* v. *Hull*,* says, a sale by executors, without an order of court, and by private contract, is void; and to the same effect is the case of *Lanfear* v. *Harper*.† The defendants having failed to prove that any order of court was ever given to make these sales, they are nullities, and confer no titles. And this is the decision in *Paterson* v. *Gaines*,‡ which is reaffirmed in *Gaines* v. *Hennen*.§ It is useless to discuss the point further, as we see no reason to question the correctness of the conclusion at which the court arrived in those cases.

It is insisted the defendants are protected by reason of conveyances from Relf and Chew, as attorneys of Mary Clark, the universal legatee under the provisions of the will of 1811. The invalidity of this defence has been also sustained by this court in the cases just referred to. But even if the power of attorney, on which these conveyances were predicated, was not defective, and the other proceedings were regular, still, by the law of Louisiana and the decision of her highest court, Mary Clark, as sole instituted heir, could give no title as against the real and paramount heir. The effect of the probate of the will of 1813, if Myra Clark Gaines is legitimate, and that we have found to be true, is to make her sole heir of Daniel Clark, and, as a consequence, Mary Clark could in law have no title as heir, and could convey none. Although French jurists have differed on this subject, the question is set at rest by the decision of the Supreme Court of Louisiana, in *Ripoll* v. *Morina*.‖ Sebastian Ripoll died, in 1836, in New Orleans, and left by will a large estate to Teresa Morina, his universal legatee, who was, also, his natural daughter. She was put in possession of the estate by the

---

* Martin, N. S., 113.　　　† 13 Louisiana Annual, 548.
‡ 6 Howard, 550.　　　§ 24 Id. 553.　　　‖ 12 Robinson, 560.

judgment of the Probate Court as testamentary heir.  The will was contested by two sisters of Ripoll, who represented they were the only heirs of their brother; but long before the contest commenced, and while Teresa was the apparent heir, and in the undisturbed enjoyment of the property, she sold part of the real estate at its full value to *bonâ fide* purchasers.  One of the questions in the case was, whether those who purchased property from the apparent heir or universal legatee, in possession of the estate as such heir or legatee, could defend against the claim of the legal and actual heir, and the court decided they could not.  In discussing the question they say: "Our code, art. 2427, declares that the sale of a thing belonging to another is null," and that the purchasers of the property in dispute can, under no circumstances, acquire any greater right or any better title to it than their vendor had.  As to the defence of good faith, the court decide, "that all the law has done in favor of a purchaser in good faith is to give him the benefit of the limitation by prescription, though the property so purchased may belong to another person," and refer in support of their position to the Civil Code, arts. 3442, 3450, 3451.  That case is decisive of this on the point we are considering, and goes further than the necessities of this case require, because Mary Clark was never recognized by the Probate Court as heir, or put in possession of the property.

It is argued with earnestness that the estate of Daniel Clark was insolvent, and the real heir cannot have it until the debts and legacies are paid.  If this defence were true in fact, which it is not (but we do not care to discuss the evidence in order to show it), it cannot avail these defendants.  They are concerned to show a better title than the complainant, and if they cannot do it, are not at liberty to make a collateral issue by proving the estate in debt more or less.  If the executors rightfully sold the property in controversy they are protected; but they cannot substitute themselves for the creditors of the estate, and use them as a means to get protection.

A kindred defence to this is, that the Probate Court of New Orleans, in 1841, duly approved of the sales made by Relf and Chew as executors, and that this homologation is binding upon the complainant. This court in the Hennen case said, "We do not think the accounts of Relf and Chew are put in issue by the bill of complainant, or the answer of the defendants, particularly as Relf and Chew are not parties to this proceeding."

But the objection to this defence lies deeper than this; for if it were true the accounts were duly homologated, these defendants are not benefited by it, because the Probate Court could not by a subsequent order give validity to sales made by executors, which were null and void by the law of the State when they were made. It is, however, not true that the executors' accounts were duly homologated, as the court, in its order of confirmation, say, "they are confirmed in all respects in which they are not opposed." As the opposition of Mrs. Gaines (more interested in the matter than any other person) has never been withdrawn, but is still active, the question is an open one in the Court of Probate.

Although the legal title to the property in dispute was in Daniel Clark at the time of his death, yet it is said there is an outstanding equitable title in Relf and Chew to two-thirds of it, by virtue of a partnership agreement between them and Clark, of the date of 19th of June, 1813, which will defeat, *pro tanto*, the recovery the complainant seeks to obtain by her bill.

This defence is provocative of more comments than we have time to make, or the necessities of this suit require us to make. It is extraordinary, if the agreement relied on was a valid and executed contract at the time of Clark's death, those interested to know it should have remained in ignorance of it for a period of twenty-five years. During this long time it is equally concealed from creditors, purchasers of property, and the Court of Probate. Why was no title asserted under it when the estate was inventoried? Why were not creditors informed of it, who were interested to

know the extent of the estate to which they had to look for the payment of their debts? *Ante motam litem*, nothing is heard of it; but when Mrs. Gaines attempts to "unkennel" the fraud by which she was deprived of her just rights, *it* sees the light. If Relf and Chew were the real owners of two-thirds of every piece of property which they sold, why not recite the fact of joint ownership in the conveyances which they made? Why sell all the property either as executors of the will of 1811, or as attorneys of Mary Clark? No satisfactory answers can be given to these questions, or reasonable explanation to the conduct of Relf and Chew, on the theory that the agreement thus attempted to be set up to defeat this suit was a completed contract when Clark died.

If, however, it was, and there is an outstanding equitable title in Chew and Relf to the property in litigation, the defendants cannot plead the fact in bar of the right of complainant to recover. The defendants, equally with the complainant, claim title from the same common source. This is clear from the pleadings and proof. If, therefore, both parties claim title from the same person, neither is at liberty to deny that such person had title. On this point the Louisiana authorities are uniform.* The rule is the same in equity as at law, and is well stated in *Garrett* v. *Lyle*.† The court in that case say: "We do not deny in equity as well as at law the plaintiff must recover upon the strength of his own title; but because this is the rule it does not follow he must show a good title against all the world; it is enough that he shows a right to recover against the defendants. And there are many cases in which he has this right, although another person must recover it from him."

The defendants, as a further defence to this action, say they are purchasers in good faith for value without notice, or have acquired titles from those who were, and will, there-

---

* Crane *v.* Marshall, 1 Martin (N. S.), 578; Bedford *v.* Urquhart, 8 Louisiana, 239; Cobton *v.* Stacker, 5 Louisiana Annual, 677; Girault *v.* Zuntz, 15 Id. 686.

† 27 Alabama, 589.

fore, be protected by a court of equity. We cannot see, in view of the discussion already given to this case, how this plea can be true; but as it cannot avail the defendants if true, it is unnecessary to discuss the evidence further in order to ascertain whether it is true or false. For the question at issue in this case is only on the legal title. The complainant insists she has that title, and if so, her right to enforce it is very clear. On the contrary, the defendants, conceding that Daniel Clark, the father of complainant, had the title when he died, say it has been divested by sales made under the will of 1811, either by the executors or Mary Clark, the instituted heir, and that they now hold it.

In deciding the issue thus presented, the defence, that although the sales were irregular, those who bought the property did it in good faith and without notice, and are protected, cannot avail the defendants unless accompanied by the plea of prescription. As we have said in a previous part of this opinion, all that the law of Louisiana has done to protect one who has bought property in good faith, although it shall turn out the property belongs to another person, is to give him the benefit of the bar of time prescribed by the code.* If the complainant was endeavoring to establish an equitable title, this court, if it saw proper to do so, could refuse to her the use of the peculiar powers of a court of chancery in aiding to establish it against the purchaser of the legal estate who had acquired it fairly and honestly. As she is not doing this, but is contesting her right to the legal estate, we cannot see how either in a court of law or equity she can lose that right because the defendants have purchased in good faith what they supposed was the legal title.

This brings us to the only remaining defence which we shall notice, and that is the bar by prescription. In this connection the question of good faith is always important. The law in its liberality so far protects every honest and fair buyer of real estate, that it limits the time in which actions

---

* Repoli *v.* Morena, 12 Robinson, 560.

shall be brought against him to oust him of his possession. But the title of complainant is not barred by prescription according to the law of Louisiana. This defence was made in the case of *Gaines* v. *Hennen,* so often referred to, and disposed of adversely to the defendant, and is no longer an open question in this court. The prescription relied upon by the defendants, in this case, is the same that was relied upon by the defendant in that, and as the proofs are common to both, it follows, as the plea of prescription was not available in the one, it is not in the other.

Courts, in the administration of justice, have rarely had to deal with a case of greater hardship, or more interesting character and history, than the one we are now considering. Daniel Clark, a prominent citizen of Louisiana in its early history, died in New Orleans in 1813, leaving by will his large estate to the complainant, then a child of tender years, who has never enjoyed it, but is now, after the lapse of fifty-five years from the death of her father, struggling to get it. Clark wrote this will with his own hand; lodged it as he supposed in a safe place, to be confided to one of his executors, who was also the selected tutor for his child; explained its contents, and expressed his solicitude about it to several friends, and died in the belief he had secured to his child his estate; and yet, after his death, the will cannot be found, and no reasonable mind, from the evidence in the case, can doubt that it was purloined and destroyed. Another will, written two years before, with different disposition of property, is allowed to go to probate, unchallenged by the friends of Daniel Clark, in place of the one thus destroyed, and the estate is administered under it for a period of twenty-five years, without account of administration rendered to the Court of Probate. In the meantime, the complainant remained where she was placed by her father, in the family of Samuel B. Davis, until she was married. Davis, as he swears, maintained and educated her at his expense. When he left New Orleans for the North, with the child, about a year before the death of Clark, he retained in his hands, at

the instance of Clark, twenty-three hundred and sixty dollars (for which he gave his note), the interest of which was to go towards the education of the daughter. This sum of money, small as it was, was withdrawn from him by proceedings instituted against him by the executors shortly after Clark's death, and the child lost the use of it, although these executors, intimate friends and partners in business with Daniel Clark, must have known that Clark was the father of the child, and must also have known her necessities.

To the discredit of the friends of Daniel Clark, this child grew to womanhood in utter ignorance of her rights and parentage, and did not ascertain them until 1834 (then not fully); since which time she has been endeavoring to obtain her rightful inheritance. Owing to the lapse of time, it was difficult to reach the truth, and, necessarily for many years, she groped her way in darkness; but finally she was able to show the great fraud perpetrated against her; for, in the judgment of the Supreme Court of Louisiana, she established the validity of that very will, which, forty-three years before, her father had executed in her favor. This action of that court settled what was before doubtful—her civil status—and removed the difficulty she had formerly encountered in pursuit of her rights. The questions of law and fact applicable to those rights were determined in the case of *Gaines* v. *Hennen.* After argument by able counsel, and on mature consideration, we have reaffirmed that decision. Can we not indulge the hope that the rights of Myra Clark Gaines in the estate of her father, Daniel Clark, will *now* be recognized?

The decree of the Circuit Court for the Eastern District of Louisiana is REVERSED, and this cause is remanded to that court, with instructions to enter a decree for complainant

IN CONFORMITY WITH THIS OPINION.

GRIER, SWAYNE, and MILLER, JJ., dissented.

### NOTE.

At the same time with the preceding case of *Gaines* v. *New Orleans,* was decided another appeal in equity, from the same circuit with it, and depending in the main upon the same issues; the difference between the two cases being, that in the last case the controversy concerned the sale of slaves belonging to the succession of Clark, while in *Gaines* v. *New Orleans* it related to real estate. The case just named must be read in order to understand the one now reported, of an adjectitious character.

